# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

### Appeal No. 24-1209

_____

### UNITED STATES OF AMERICA
### Appellee

### v.

### ARIEL LEGASSA
### Appellant

_____

### On Appeal from a Judgment
### of the
### United States District Court
### For the District of Massachusetts

_____

### BRIEF AND ADDENDUM OF THE
### DEFENDANT-APPELLANT

_____

**Respectfully submitted,**


**By his Attorney,**


**LESLIE FELDMAN-RUMPLER**
**Attorney-at-Law**
**4 Cypress Street, Suite 7**
**Brookline, MA 02445**
**(617) 728-9944**
**Leslie@feldmanrumplerlaw.com**

**February, 2025**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .........................................................i

STATEMENT OF ISSUES ...........................................................1

STATEMENT OF JURISDICTION ............................................1

STATEMENT OF THE CASE .....................................................1

    Introduction .........................................................................1

    Mr. Legassa's Motion in Limine and
    the Pretrial Conference ......................................................2

    Mr. Legassa's Employment at NESN ...............................4

    NESN's Agreements with Alley NY .................................8

    Payments to Alley NY and Alley CT ................................9

    Tracking the Digital Budget ..............................................11

    Funds Transferred Out of the Alley CT
    Account ...............................................................................15

    Testimony Regarding "Fraud" ...........................................15

    Expenditure Evidence .......................................................16

SUMMARY OF ARGUMENT....................................................21

I.    THE TRIAL COURT ABUSED ITS DISCRETION
    WHEN IT PERMITTED A GOVERNMENT
    WITNESS TO REPEATEDLY TESTIFY TO
    THE LEGAL CONCLUSION THAT MR. LEGASSA
    HAD DEFRAUDED NESN................................................23

    Standard of Review ............................................................23

    A. Mr. Guilbault's "Fraud" Testimony Did Not
    Meet the Requirements of F.R.E. 701 ................................23

B. The Trial Court's Error in Admitting
This Testimony Was Not Harmless ...................................28

II.    THE TRIAL COURT ABUSED ITS
DISCRETION BY PERMITTING THE
GOVERNMENT TO PRESENT EXCESSIVE
DETAILED EVIDENCE REGARDING
MR. LEGASSA'S EXPENDITURES OF
THE FUNDS FROM THE ALLEY CT
SANTANDER BANK ACCOUNT. ................................31

Standard of Review ................................................................31

A. The Trial Court Abused its Discretion
When it Permitted the Government to
Present Testimony Regarding
Purchases on Mr. Legassa's Credit Card ..........................31

B. The Trial Court Abused its Discretion
When it Permitted the Government to
Present Testimony Regarding Two Transfers
of Funds from the Legassas' Joint Savings
Account to Accounts in Nilda Legassa's
Name on January 7 and 10, 2022 .......................................34

III.    CONCLUSION ...................................................................36

IV.    CERTIFICATE OF COMPLIANCE .................................37

V.    CERTIFICATE OF SERVICE...........................................38

## TABLE OF AUTHORITIES

### Cases

*United States v. Appolon*,
    695 F.3d 44 (1st Cir. 2012) ................................................32

*United States v. Carbone*,
    110 F.4th 361 (1st Cir. 2024) ...........................................32, 36

*United States v. Doe,*
    860 F.2d 488 (1st Cir. 1988) ...........................................34

*United States v. Fulmer*,
    108 F.3d 1486 (1st Cir. 1997) ........................................28

*United States v. Grinage*,
    390 F.3d 746 (2d Cir. 2004) ...........................................27

*United States v. Gobbi*,
    471 F.3d 302 (1st Cir. 2006) ...........................................23

*United States v. Kilmartin*,
    944 F.3d 315 (1st Cir. 2019) ...........................................28, 34

*United States v. Quattrone*,
    441 F.3d 153 (1st Cir. 2006) ...........................................22, 33

*United States v. Ramos-Baez*,
    86 F.4th 28 (1st Cir. 2024) ................................................36

*United States v. Rea*,
    958 F.2d 1206 (2d Cir. 1992) ...........................................22, 27

*United States v. Reda*,
    787 F.3d 625 (1st Cir. 2015) ...........................................22, 27

*United States v. Rodriguez*,
    115 F.4th 24 (1st Cir. 2024) ................................................31

*United States v. Sanabria,*
    645 F.3d 505 (1st Cir. 2012) ...............................................27

*United States v. Santana-Avilés,*
    120 F.4th 7 (1st Cir. 2024) ...................................................31

*United States v. Soler-Montalvo,*
    44 F.4th 1 (1st Cir. 2022)) ...................................................31

*United States v. Valbrun,*
    877 F.3d 440 (1st Cir. 2017) ...............................................23

*United States v. Varoudakis,*
    233 F.3d 113 (1st Cir. 2000) ...............................................32, 36

<u>Rules</u>

F.R.E. 701 ......................................................................22, 23

F.R.E. 704 ..........................................................................27

F.R.E. 403 ......................................................................22, 32

<u>Statutes</u>

18 U.S.C. § 1291 ....................................................................1

18 U.S.C. § 1341 ....................................................................1

18 U.S.C. § 1957 ....................................................................1

STATEMENT OF ISSUES

1.    Whether the district court abused its discretion when it permitted a government witness to testify repeatedly to the legal conclusion that Mr. Legassa had defrauded his employer.

2.    Whether the trial court abused its discretion when it permitted the government to present testimony about Mr. Legassa's credit card expenditures, including specific purchases, and testimony regarding two transfers of funds from the Legassas' joint savings account to two accounts owned by his wife shortly after the termination of his employment.

STATEMENT OF JURISDICTION

This Court has jurisdiction over this case pursuant to 18 U.S.C. § 1291.

STATEMENT OF THE CASE

On February 17, 2022, the defendant, Ariel Legassa was charged by

indictment with seven counts of mail fraud (18 U.S.C. § 1341) and three counts of

money laundering (18 U.S.C. § 1957). After a five-day jury trial, he was convicted

on all counts. App. 782-783.

Introduction

The case arose out of Mr. Legassa's employment as Vice President of

Digital Operations at New England Sports Network ("NESN"). The government

presented evidence that he had created a company with the same name as one of

NESN's vendors and used it to bilk NESN out of $575,000. The vendor was a

New York company called Alley Interactive, LLC ("Alley NY"). Mr. Legassa

registered another Alley Interactive, LLC in Connecticut ("Alley CT") and opened

a bank account in its name with himself as the sole owner.  He submitted Alley CT invoices for payment and told accounts payable to send the checks to the Alley CT address, tricking NESN into writing checks totaling $575,000 to an account that he controlled.  Mr. Legassa's defense was that NESN's top executives knew they were writing checks to Alley CT.  They had agreed to make these payments as a way of providing additional compensation to him at a time when NESN's Digital department was in crisis, he was dissatisfied with his job and they needed him to stay.

The mail fraud counts were all based on checks written to Alley CT.  R. 25. The wire fraud counts were based on  transfers of funds out of the Alley CT bank account.  R. 26.

<u>Mr. Legassa's Motion in Limine and the Pretrial Conference</u>

Mr. Legassa raised the issue of the detailed personal information contained in Mr. Legassa's financial records in a motion in limine on October 6, 2023. Doc. 111.  A week later, the government filed its opposition, stating that the information was relevant, but that it could use summary charts to obviate the need for the detailed records. Doc. 119.

By the time of the pretrial conference, eleven days before trial, the government had not yet produced the summary charts. Add. 18.  Defense counsel said he was told that the charts would be provided the following Friday, the day

before trial. Add. 18:22-25-Add. 19:1.  Mr. Legassa argued that that the only

relevant question was how much money went into the Alley CT Santander account

and how much he withdrew from that account, but not how the money was spent.

Add. 19.  The inclusion of these detailed records was an invasion of privacy and

also that its real purpose was to create "an image that here's a family living high on

the hog because they just had this windfall." Add. 20:12-14.

The government responded that it was entitled to show what the money was

spent on, including individual purchases, to show that Mr. Legassa was living

beyond his means with large amounts of loans.  This, the government argued, went

to motive, a central issue that it needed to prove. Add. 21:22-25 - Add. 22:1. Mr.

Legassa maintained his position that the details of his credit card purchases were

not relevant, and the government could instead present evidence that the money

was used to pay off credit cards without including the details of the purchases.

Add. 22:19-21.  The Court indicated its agreement with the government, saying

Mr. Legassa had not articulated grounds to keep these details out.  The Court

encouraged the parties to reach agreement on redactions. Add. 23-24.

The prosecutor stated emphatically that the government did not expect to

offer credit card records unless Mr. Legassa or his wife testified; they planned to

use the summary charts. Add. 24-25.  He indicated that the government may show

documentation of the payoffs of the Tesla loan and the private plane "briefly to just

have the financial analyst explain how they concluded what the payment was for and who it was for." Add. 25:2-4.

<u>Mr. Legassa's Employment at NESN</u>

Mr. Legassa was hired by Raymond Guilbault, NESN's Chief Financial Officer, through a recruitment firm in September, 2019. He started with a base salary of $255,000. He managed the development and launch of new digital products, the website, Roku and Apple TV and a video library. R. 444-445. He onboarded NESN's first digital product team, including six new hires. R. 450. He also personally managed the addition of 14 new vendors. *Id.* Mr. Guilbault, retired by the time of trial (R. 347), acknowledged that getting all of this done in 2020 was a milestone accomplishment R. 450-451. Mr. Legassa worked hard for NESN. From Monday through Friday, he stayed at an apartment in Watertown, where NESN was headquartered, though his wife and four children lived in Connecticut. R. 723.

The COVID pandemic began just months after he was hired, and NESN began focusing on Direct To Consumer ("DTC") services, through which consumers could view content directly on mobile phones. R. 357. NESN also had sports betting content on its website, known as NESN Bets, and ultra-high definition "UHD," also known as NESN 4K. *Id.* By 2021, the digital group was working with 20 vendors. R. 356-359.

Mr. Legassa's salary history at NESN reflected both his accomplishments and the impact of the COVID pandemic on the company. R. 411-413. He took a salary cut of approximately 10% in July 2020, as did the other management employees. R. 411. He later received merit increases: on September 30, 2020, (to $238,679); on January 1, 2021 (to $265,000), and on September 30, 2021 (to $272,625). With that last merit increase, he also received an equity adjustment, bringing his salary to $325,000. R. 412. The equity increase was approved by both Mr. Guilbault and Sean McGrail, CEO of NESN. R. 412-413.

Among Mr. Legassa's responsibilities was the selection and management of the digital group's vendors, including Alley NY. R. 352, 371. His discussions with the company began in December, 2020. R. 539. On February 1, 2021, he emailed Alley NY's CEO, Bradford Campeau-Laurion, requesting a W-9. R. 542. He also requested an invoice for 10 hours, saying he needed it to start the admin process internally. *Id.* Mr. Campeau-Laurion provided the W-9, but no invoice, as the hours spent at that point were part of business development. *Id.* On February 10, 2021, Mr. Legassa again requested an invoice. R. 544. Mr. Campeau-Laurion responded that invoicing could not begin until contracts were signed. *Id.*

Leatha Fisher, NESN's payroll manager and head of accounts payable, testified that no invoice was required to set up a vendor's account. R. 566-568. On, March 9, 2021, she emailed Mr. Legassa, asking him to have Alley NY

provide its W-9, and he did so. R. 1031-1033.  He also provided two invoices, and told her to send payment to Alley CT at its address in Stamford. R. 1031-1032.  On April 8, 2021, he emailed her, asking for help creating a separate account for Alley CT. He wrote, "[t]hey have two entities working together but separately incorporated. They plan to merge the two entities at the end of the year, and they asked me to please create a separate account and sent (sic) payment separately until then." R. 1034-1035.

A Certificate of Organization for Alley Interactive, LLC was filed at the Secretary of State's Office in Connecticut on February 11, 2021. R. 518-519.  With such a filing, no due diligence is done to determine whether the business is actually functioning. R. 516-517.  Alley CT's papers listed a principal office address at 680 East Main Street #729, Stamford, CT; Ariel Legassa as manager of member information; and an email address of Alleyinteractivellc@gmail.com, which belonged to Mr. Legassa. R. 519-520.  The mailing address was that of a mailbox he had rented from a company called PostNet. R. 511-513.

A business checking account for Alley CT was opened at Santander Bank in February, 2021.  The same email address and mailing address that was  provided to the Secretary of State appeared in Santander's records for Alley CT. R. 524-525. Mr. Legassa was the sole signatory on the account.  The only due diligence done by Santander Bank was to check the Secretary of State's website to see if the

business is listed. R. 523.  Alley NY did not bank with Santander; its accounts

were with Chase. R. 554.

In March, 2021, NESN's management was faced with the possibility of

losing Mr. Legassa.  In an email on March 12, he had complained about senior

staff culture, and one particular employee's lack of professionalism.  He said, "I'm

reaching the end of my rope and quite honestly I didn't sign up for this when I

joined NESN." R. 1152-11534.  At trial, Mr. Guilbault denied that the digital

group was in crisis in March, 2021 until he was confronted with an email he had

written to Mr. McGrail on March 13 with the subject line, "Managing the digital

crisis."  1151-1155.  Mr. Guilbault wrote:

> [I]f we lose Ariel, all digital projects would likely be set back one to two
> years. There will be no Bets, Watch, 4K or DTC. . . . We need to leave him
> alone to do his job for the next 4 to 6 months. Every time we don't we are
> nudging him closer to the door.

R. 1152.  At the end of the email, Mr. Guilbault told Mr. McGrail, "I'm going to

call Ariel and try to calm him down. . . ." *Id.*  Mr. Guilbault testified at trial that he

reached out to Mr. Legassa on Saturday morning, March 12, 2021, asking to speak

with him that afternoon. R. 440-441.  Mr. Legassa had a family obligation that

afternoon, so they agreed to try and meet on Monday to address his concerns. R.

441-442.  Part of the issue was that three VPs had quit, putting more pressure on

Mr. Legassa. R. 443.  The lack of a real marketing professional was another

concern. *Id.*

NESN hired Ahmed Darwish as Chief Marketing Officer in charge of digital on January 1, 2022. R. 706-707.  His salary was $580,000, plus a relocation bonus and a performance bonus of $200,000. R. 709.  Mr. McGrail testified that he alone approved that salary, and did not need board approval. R. 709-710.

<u>NESN's Agreements with Alley NY</u>

Consistent with NESN's practice, an umbrella agreement known as a Master Services Agreement ("MSA") was signed with Alley NY, along with  a Statement of Work ("SOW"), a separate document setting forth the scope and cost of a particular project.  The MSA and the SOW were both dated March 3, 2021. R. 371, 545.  Mr. Guilbault reviewed the MSA prior to signing.  The SOW reflected a fixed project cost of $75,000, with the following payment schedule: $25,000 due upon execution; $25,000 due on April 15, 2021, and $25,000 due at final acceptance. R. 466:6-9, 999. The SOW allowed for an increase to $100,000 if the parties agreed in writing. *Id.*; R. 457.

A second SOW was executed on June 8, 2021, in which NESN agreed to pay Alley NY a monthly retainer of $57,000.00. R. 1002-1006. This SOW was for a different project: the enhancement of NESN's website, including DTC and two other projects; it was to last for a year. R. 381-383.

<u>Payments to Alley NY and Alley CT</u>

The following checks written by NESN to Alley, all signed by Raymond

Guilbault and Sean McGrail, were admitted into evidence:

| Exh. # | Date | Check # | NY | CT | Amount |
|---|---|---|---|---|---|
| 21 | 4/1/21 | 123841 | | √ | $110,000 |
| 22 | 4/27/21 | 123913 | | √ | $135,000 |
| 23 | 6/15/21 | 124221 | | √ | $85,000 |
| 24 | 6/24/21 | 124270 | | √ | $100,000 |
| 25 | 8/24/21 | 124661 | | √ | $48,500 |
| 26 | 10/5/21 | 124883 | | √ | $48,500 |
| 27 | 11/23/21 | 125171 | | √ | $48,500 |
| 28 | 5/20/21 | 124049 | √ | | $25,000 |
| 29 | 6/15/21 | 124222 | √ | | $50,000 |
| 30 | 7/20/21 | 124506 | √ | | $57,000 |
| 31 | 8/12/21 | 124584 | √ | | $50,000 |
| 32 | 9/29/21 | 124822 | √ | | $57,000 |
| 33 | 10/12/21 | 124927 | √ | | $82,000 |
| 34 | 11/2/21 | 125016 | √ | | $57,000 |
| 35 | 11/30/21 | 125213 | √ | | $57,000 |

R. 953-982.

The first two of these checks were out of synch with the fixed cost and

payment schedule stated in the first SOW.  The checks written on April 1, 2021

and April 27, 2021, were for $110,000 (R. 466-467) and $135,00 (R. 401),

respectively, both of which exceeded the fixed project cost in the first SOW, the

only one that had been signed at that point.  Together, totaled almost double the

$75,000 project cost.

Mr. Guilbault admitted that when he received the $110,000 check to Alley

CT for signature, two invoices were attached to it: one for $25,000 (Exhibit 10)

and one for $85,000 (Exhibit 11), for a total of $110,000. R. 468. Both invoices were from Alley CT. The address of Alley CT appeared in handwriting on the top left hand side of the $25,000 invoice (R. 166, 942); the $85,000 invoice had no address listed on it. R. 943.

The second check to Alley was dated April 27, 2021, in the amount of $135,000. Attached to that check were invoices from Alley CT, now with the Connecticut address appearing in typeface. R. 944-945. One of the invoices was for $85,000 and the other was for $50,000, which together totaled $135,000. R. 471. Mr. Guilbault signed that second check, dated April 27, 2021. R. 471.

The Alley CT invoices looked exactly the same as those from Alley NY except for the mailing address. R. 396. Mr. Guilbault testified that he did not look at the address. R. 394-395. He trusted and relied on Mr. Legassa, V.P. of digital, and signed the checks to Alley CT, believing that the checks were going to Alley NY. R. 403-404. Mr. Guilbault testified that he would sign checks in stacks ranging from 15 to 40 at a time, once a week. R. 367-368. This could take between 5 and 20 minutes. R. 367. He would look at each check and if it was for a vendor he was familiar with and an amount that made sense, he would sign it. R. 368:14-15. He testified that he was familiar with Alley NY, though he did not remember that they were based in New York. R. 396-397. Mr. McGrail testified that he would sign the checks after Mr. Guilbault had already approved and signed them,

and he estimated that he would sign between 50 and 200 checks per week. R. 714-715.

On June 15, 2021, Mr. Guilbault and Mr. McGrail signed two checks to Alley[1]: one for $85,000 (Exh. 23) and one for $50,000 (Exhibit 29).

NESN used a system called FIDESIC to pay its vendors. R. 363-364. Invoices would be uploaded, to be forwarded to the appropriate parties for approval. The system had approval limits, beyond which higher level approval was required.  Mr. Legassa's approval limit was $50,000.  That meant that he was authorized to approve an invoice for any amount below that limit, without anyone else receiving notice of the invoice. R. 365.

Tracking the Digital Budget

The finance team was responsible for monitoring the budget. R. 362.  In 2020-2021, Paul King, Account Manager and Senior Finance Manager, tracked the performance of the digital budget. R. 624.  This included reviewing the MSA and the SOW. R. 631.  Mr. King had ongoing conversations with Mr. Legassa to discuss how the digital department was performing against the budget. *Id.*  He wanted to meet with Mr. Legassa once a month, but they met approximately six times during the year. R. 626.  He would ask for documentation - statements of

---

[1]  As used from here forward, "Alley" refers to the company name, without specific reference to Alley NY or Alley CT.

work, invoices, etc., and Mr. Legassa would say that getting documents would delay the vendor's work. R. 627.

In 2021, Alley NY was among the three digital vendors with the largest budgets. R. 629. When Mr. Legassa couldn't answer questions about these vendors, Mr. King would contact the vendor directly. He did so with the other two highest budgeted vendors, but not with Alley NY, because Mr. Legassa did not provide a contact for them, despite his requests. R. 630. On February 11, 2021, Mr. King emailed Mr. Legassa, questioning the amount budgeted for Alley ($900K) in light of amounts budgeted for DTC, UHD, and NESN Bets/Watch. He asked if Alley was replacing some of the work other vendors were supposed to do. R. 633, 1089. Mr. Legassa responded that it was a vendor switch, with no increase to the budget. *Id.*

On June 8, 2021, he emailed Mr. Legassa, questioning an Alley invoice for $100,000 for the UHD project, that would bring them to $355,000, when Mr. Legassa had said it would be $250,000 earlier. R. 635, 1092. The invoice was from Alley CT, dated May 25. R. 947. Mr. Legassa responded that it was for one particular project, and it was the only invoice for that project. R. 1091. Mr. King accepted that answer because Mr. Legassa was a vice president. R. 637-638.

On September 8, he emailed Mr. Legassa, checking on the expenses to date for the year. R. 638. He had questions about extra charges from Alley. "So far,

we've been charged an extra 100K. Will we be charged an additional 25 to 50K?"
R. 639.  Mr. Legassa responded that another vendor's work was being transferred
to Alley, and he described extra work being done. He also said that he was
negotiating an upgraded retainer for additional work. R. 640-641.  Mr. King asked
Mr. Legassa for documentation of the upgraded retainer six times in person and in
a handful of emails, but he never received it. R. 644-645.

On October 7, he again emailed Mr. Legassa, saying he had expected to see
invoices from Alley for the $57,000 retainer amount each month starting in July,
but he had received only those invoices in July and September. He asked what to
expect for the rest of the year, requested documentation of the upgraded retainer,
and said that Alley's invoices did not provide enough detail.  R. 646-647.  He
asked for a direct contact at Alley, but he never received one. R. 648-649.  Mr.
Legassa responded that he would set up a call to respond to the questions, and he
would ask for detail from Alley, and give Mr. King access to Alley's weekly
assignments.  He said he would need help assigning the work, as he was swamped
and the level of detail is a lot of extra documentation. *Id.*

On November 15, 2021, Mr. King emailed Mr. Legassa regarding open
items in the budget being proposed for 2022, including $1 million budgeted for
Alley.  Mr. Legassa proposed an increase to $1.5 million. R. 651-651.  Mr. King
made that increase and Mr. Legassa responded via email, "[t]hank you so much,

Paul. You rock!!!!" R. 1100-1101.

In December, 2021, Alley NY's CEO, Mr. Campeau-Laurion was doing a public records search to see what was in the public record about his company, when he discovered that Mr. Legassa had incorporated Alley CT. R. 556:12-24. He advised his company's legal counsel to contact NESN's legal counsel. *Id.*

On December 29, 2021, Mr. King emailed Mr. Legassa again about the budget items, again including $1 million for Alley. R. 653.  The amount for Alley had decreased since the November 15 email. R. 654.  Mr. Legassa asked him to add $500K the Alley budget, "due to entitlement back-end work." R. 654.

On January 5, 2022, Mr. King emailed Mr. Legassa, and, under the subject line "Alley Interactive," asking for backup documentation from Alley regarding the overage work being done per the second SOW. R. 659.  Mr. Legassa said he would request the details, explaining that they were asked for a lot of last-minute projects.  He asked exactly what backup was needed. *Id.* Eleven minutes later, he emailed again, saying it would take awhile to respond, and that if he asked them for the info, "they will stop working on DTC and allocate the [project managing] resource to this." R. 660.  Between the time of the first and second emails, Mr. Legassa came over to Mr. King's desk. R. 661.

The next day, January 6, 2022, Mr. Legassa was terminated from his job at NESN. R. 661-662.  NESN sued Mr. Legassa to recover the funds he had taken. R. 409-410.

### Funds Transferred Out of the Alley CT Account

Mamek Charepoo, a Santander Bank branch manager, testified that Ariel Legassa was the sole owner of the business account for Alley CT. R. 526-527.  She testified to funds deposited and withdrawn or transferred out of that account, both by check and by wire. R. 529-535.  These transactions included an official check dated April 16, 2021 in the amount of $49,777.03, payable to Wells Fargo Auto, noted as "payoff," (Count 8); a $60,000 transfer to Mr. Legassa's credit union account on May 11, 2021 (Count 9); and a $20,000 transfer to Mr. Legassa's Citibank account on October 4, 2021 (Count 10). R. 26, R. 531, R. 533-535.

### Testimony Regarding "Fraud"

Mr. Guilbault testified that Alley CT submitted eleven invoices, and that the NESN paid a total of $575,000 on those invoices. R. 392.  He explained that the last two invoices were not paid "because I put a stop payment on [them] once I became aware of the situation regarding the fraud that was perpetrated against the company. . . by Mr. Legassa." Add. 8-9.

As detailed in Argument I, *infra*, the prosecutor elicited the "fraud" and related testimony repeatedly over defense objection.

Expenditure Evidence

The government presented the testimony of Rebecca Curtin, a forensic accountant with the F.B.I., and through her, introduced a group of exhibits (39-45, 50-57, 61-62, and 66-80) that had been placed in a binder, including credit card statements, other documents relating to Mr. Legassa's purchase and payoff of a Tesla and a private plane, his joint account with his wife and nine summary charts. R. 726-727, 1142-1150. Eight of the nine charts analyzed the expenditures from the Alley CT account, breaking down different categories of spending. R. 1143-1150.

Ms. Curtin testified regarding the deposits into the Alley CT Santander account and withdrawals and/or transfers out of that account following those deposits. This testimony described Mr. Legassa's payoffs of a Tesla he had purchased, a private plane he had purchased, transfers to a joint account owned by himself and his wife, and more. Exhibit 162 was a chart reflecting Ms. Curtin's review of the Santander account, listing seven NESN check deposits to that account for a total of $575,000. The chart covered the period between April 8, 2021 and January 19, 2022. R. 728-730, 1142. She noted that the first three deposits were for higher amounts, and the last three were all for $48,500.00. R. 730. There was an opening deposit of $100.00 and there were cash deposits in the amount of $4,020, but 99% of the deposits were NESN checks. R. 730-731.

She also presented Exhibit 163, a chart showing withdrawals from the
Santander account in different categories, and covering the same time period as
Exhibit 162. R. 1143. These charts were admitted without objection.  Ms. Curtin
saw no payroll expenses or vendor payments from the Santander account. R. 733.
She testified that $248,105 from the Alley CT Santander account was used to make
payments to ten different credit cards across six financial institutions. R. 733-734.
Other withdrawals included wires to the Legassas' joint checking account
($156,500), a Tesla payoff  ($49,777), a Piper airplane payoff ($27,000) a Land
Rover payment (about $20,000), a wire to Citibank ($20,000), tax payments
($16,000), cash withdrawals ($16,000), payments to Kendall Realty Trust
($12,000), other payments ($8,000), and a Chippanee Construction LLC payment
($7,000). R. 734, 1143.

Ms. Curtin also presented a chart, Exhibit 164, showing the amounts of Mr.
Legassa's credit card monthly purchases and balances from January 17, 2020 and
after. R. 735-736, 1144.  The chart showed that in April, 2021, after the Santander
account began receiving NESN checks, Mr. Legassa's spending went up
significantly. Between April and December, 2021, it ranged between $25,000 and
$48,000 per month. R. 736.  The credit card balances remained relatively
consistent during this period. R. 736-737.

The government sought to introduce another chart, Exhibit 165, that detailed the types of credit card purchases Mr. Legassa had made, totaling $326,000. R. 740. Mr. Legassa objected, making reference to his motion in limine.

> I did raise this at pretrial as well. . . . [W]hen we've got credit card purchases in a bar graph and when we've got two charts previous -- so that would be Exhibits 164 and 163 -- 163 shows the total amounts spent on credit cards. Getting down this this type of nitty-gritty on what the credit card purchases were actually for . . . is not relevant. . . . [I]t's prejudicial in that it shows amounts that . . . could seem excessive for certain things to people. . . . [W]hat's . . . relevant is that the money went for personal expenses, not that this percentage of it went to Amazon, this percentage of it went to bars and alcohol and restaurants, et cetera. So I think that this chart is unnecessary, overkill, and finally, an invasion of privacy of Mr. Legassa's family members.

R. R. 737:19-25 -738:1-10.

The government responded it had to provide evidence to support its claim that these were personal expenditures, and it promised to be brief. R. 738-739. The trial court allowed questioning on the chart and permitted the government to redact the personal, unduly prejudicial references, such as bars and alcohol. *Id.*

Ms. Curtin testified that the total amount spent via credit cards was $326,000 after April 8, 2021. R. 740. She then testified in detail regarding the purchases, giving examples of home improvement projects for which payments had been made to Home Depot and Lowes. "I saw that there was a pool installed at Ariel Legassa's house, as well as a pool shed. There were some paving purchases as well." R. 741. She mentioned the pool and shed again in her testimony about a

home equity line of credit in Nilda Legassa's name. R. 748-749. She further testified that $55,000 was spent on Amazon purchases; $25,000 on retail, $12,000 on European travel, and $12,000 on "aircraft or flying." R. 741-742.

Ms. Curtin also testified about wire transfers totaling $156,000 to the Legassas' joint checking account at American Broadcast Employees Federal Credit Union. R. 742-743.  Another chart reflecting these wire transfers was admitted without objection as Exhibit 166. R. 774, 1145.  She also testified about activity in the Legassa joint checking account (R. 747-750), and presented Exhibit 168 and 169, charts summarizing that account activity for May 11, 2021 and December 7-9. 2021, respectively. R. 1147-1148.  She then presented Exhibit 170, showing the deposit of the first April NESN check to Alley CT on April 8, and the withdrawals from that time through April 23. R. 1149.  She described the activity summarized in the chart, which included a repeat of big-ticket items previously mentioned, such as the payoff of the Piper plane and the Tesla payoff. R. 752-755.

Mr. Legassa again objected when the government sought to elicit testimony about Amazon purchases related to automobiles. R. 757.  The trial court began to address the prosecutor, and he interrupted, saying "I can move on." *Id.*  The prosecutor began another question with reference to another chart, and the court initiated a sidebar conference.  At sidebar, the court stated: "I overruled the defendant's objection on the volume of material you're getting, but you're really

pushing the envelope here." The prosecutor said he had just one final chart "and then I'll sit down." *Id.*

The final chart was Exhibit 171, showing non-mortgage loan balances from January 2020 through December, 2021. R. 1150. It was admitted over Mr. Legassa's objection. R. 758. Ms. Curtin testified that Mr. Legassa's loan balances went up in March, 2020, and they went down quite a bit starting in April 2021, when the Alley CT Santander account began receiving NESN checks. R. 759.

The prosecutor then sought to elicit testimony about the two transfers from the Legassas' joint savings account to Nilda Legassa's checking account. Mr. Legassa objected, and the court initially sustained the objection. *Id.* At sidebar, the prosecutor explained that the evidence he sought to elicit would show consciousness of guilt; Mr. Legassa had drained the savings account and moved "all the money he had access to" (R. 761:6-11) into his wife's account in the days after his January 6, 2022 termination from NESN. Mr. Legassa objected, stating that transferring the money was equally consistent with his belief that he was entitled to that money. A discussion of the timing of NESN's civil suit followed. Mr. Legassa stated that he was not on notice of the suit when the funds

were transferred. R. 760-763, Add. 26:6-8.  The court overruled the objection, as

follows:

> The underlying evidence is already in. I'm going to allow this and you both
> can make your arguments. I can't say that there isn't a potential relevance to
> the government's case, and then you can make the argument back and forth.
> I think there's a danger in the argument for the defendant because while
> people, as a matter of practice, try to protect their assets, I don't think you
> have a right to try to disgorge -- hide your assets when you know -- you
> know it's just a thing. It's not particularly helpful, but I'm going to allow it
> in.

Add. 26:12-22.  The court then reconsidered its earlier ruling on the chart showing

categories of credit card payments (Exhibit 165), and excluded it, as the jury had

already heard the testimony on the big items. Add. 26-27, R. 760-763.

Ms. Curtin testified that on January 7, 2022, there was a transfer of $22,000

from the joint savings account to Nilda Legassa's home equity line of credit, and

on January 10, 2022, there was a transfer to her savings account. R. 764.  After

that, the account balance remaining in the joint savings account was $5.00. R. 765.

Ms. Curtin's testimony concluded, and the government rested. R. 765.

Mr. Legassa moved for a judgment of acquittal pursuant to Fed. R. Crim. P.

28, and the motion was denied. R. 766.

The jury convicted Mr. Legassa on all counts. R. 16, Docket Entry 149.

## SUMMARY OF ARGUMENT

1.     The trial court abused its discretion when it permitted Mr. Guilbault to

testify repeatedly, over defense objection, to the legal conclusion that Mr. Legassa

had defrauded NESN.  The government did not lay the necessary foundation

pursuant to F.R.E. 701 to admit these statements as lay opinion testimony.

Mr. Guilbault's testimony did not meet the first two requirements of the rule: that it

be based on the personal perception of the witness, and that it be helpful to a clear

understanding of the witness' testimony determining a fact in issue. *United States*

*v. Rea*, 958 F.2d 1206 (2d Cir. 1992). The error was not harmless, as it went to the

heart of the government's case.

      2.    The trial court abused its discretion when it permitted the government

to present testimony regarding specific transactions on Mr. Legassa's credit card,

and testimony about two transfers of funds from the Legassas' joint savings

account to Nilda Legassa's home equity line of credit. To the extent that this

evidence was relevant to show motive, which is was not, it was more prejudicial

than probative. *See, United States v. Carbone*, 110 F.4th 361, 390 (1st Cir. 2024).

The repeated mention of the pool and pool shed at the Legassas' home, European

travel, and aircraft-related expenses were improper appeals to class prejudice, and

the trial court gave no limiting instructions. *United States v. Quattrone*, 441 F.3d

153, 187 (1st Cir. 2006).  The error in admitting the credit card charges and the

transfers was not harmless.

<u>ARGUMENT</u>

I.    THE TRIAL COURT ABUSED ITS DISCRETION WHEN
IT PERMITTED A GOVERNMENT WITNESS TO TESTIFY
REPEATEDLY TO THE LEGAL CONCLUSION THAT MR.
LEGASSA HAD DEFRAUDED NESN.

<u>Standard of Review</u>

This Court reviews evidentiary rulings, including decisions to admit lay

opinion testimony, for abuse of discretion. *United States v. Valbrun*, 877 F.3d 440

(1st Cir. 2017), *citing, United States v. Gobbi*, 471 F.3d 302, 311 (1st Cir. 2006).

While counsel did not immediately object the first time Mr. Guilbault testified that

Mr. Legassa had defrauded the company, he forcefully objected when the

government sought to present a repeat of that testimony.

A.    Mr. Guilbault's Fraud Testimony Did Not Meet the Requirements
of F.R.E. 701.

The admission of repeated testimony by NESN CEO Raymond Guilbault of

that Mr. Legassa had committed fraud.  It did not meet two of the three

requirements for admissible lay opinion testimony pursuant to F.R.E. 701, and it

was unduly prejudicial to Mr. Legassa, as it allowed a government witness to

testify to the conclusion of the government's argument without articulating the

basis for that conclusion.

The only rule of evidence that permits a non-expert witness to testify to a

conclusion is F.R.E. 701, which governs lay opinion testimony.  It requires that the

testimony be: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

The government made no effort to lay a foundation for this damaging testimony pursuant to Rule 701. Instead, the prosecutor showed Mr. Guilbault a chart listing all of the Alley CT invoices (R. 1140), and asked a series of "why" questions about the last two invoices.

Q:    What happened to the invoices that have the three stars next to them?

A:    Those invoices were not paid.

Q:    Why not?

A:    Because I had put a stop payment on those two invoices once I became aware of the situation regarding the fraud that was perpetrated against the company.

Q:    By whom?

A:    Mr. Legassa.

R. 392-393.

After further testimony about the invoices from Alley CT and Alley NY; the sameness of the logo on both; Mr. Guilbault's belief that the checks he was signing were going to Alley NY; and the number of checks he estimated he signed that entire year ("thousands,"); the prosecutor returned to his questions about the last

two invoices, which were not paid.

Q:    So you can just remind everyone, what happened with those last
      two payments?

      DEFENSE COUNSEL: I am going to object.

      THE COURT: Can you reframe the question?

The prosecutor then repeated the question he had asked before:

Q:    Yes. What happened to the last two payments, the last two invoices?

A:    I instructed accounting to stop payment on those invoices.

Q:    And why did you make that instruction?

R. 404.

      Mr. Legassa again objected, on the ground that the question was asked and

answered, and that the witness was being asked to testify to a legal conclusion.

R.404-405.  The court told the prosecutor to ask question in a more limited way,

"because we don't need him to testify to the final conclusion." R. 405.  But the

result was the same:

Q:    Mr. Guilbault, just focusing on what you did at the time and not --and not
      characterize it,  . . . you mentioned that you canceled the last two checks.
      What was it about these two invoices that led you to cancel    payment?"

A:     It had come to my attention that those payments were being made to a
      fraudulent company.

R. 405-406.  Defense counsel objected again.  The court instructed the

witness to "keep the adjectives out and just stick to what specifically

happened or didn't happen." *Id.*  Mr. Guilbault then re-worded his answer:

"So I instructed accounting not to make those payments because I became aware

that there might be a problem with those invoices."  R. 406.

Thus, the jury heard Mr. Guilbault testify twice to his conclusion that there

had been fraud, and a third time, with the word "problem" standing in for the word

"fraud."  Mr. Guilbault never testified to what facts led him to stop payment of the

last two invoices.

Soon after the fraud testimony, Mr. Guilbault testified that he that he had not

agreed to pay Mr. Legassa through a third party.  When the prosecutor asked why

he would not have agreed to do that, Mr. Legassa objected. R. 424.  The court

allowed the question, and Mr. Giulbault answered, "[b]ecause that would be

"unethical and illegal." R. 424-425.  The court then struck the answer, but gave no

curative instruction. R. 425.[2]

Mr. Guilbault's fraud testimony did not meet the first requirement of Rule

701 because the answers did not establish that the witness' opinion was based on

his own perception.  To the contrary, it appears to have been based on hearsay.  He

did not point to any specific fact that he observed.  Instead, he testified that he

---

[2]  Mr. McGrail was also asked why employees were never pay through third-party
vendors and he answered, over defense objection, that it would be "totally
inappropriate," and that employees were paid through ADP, which allows for
taxing, social security and everything that gets done in payroll. R. 718:16-20.
Leatha Fisher testified similarly, also over Mr. Legassa's objection. R. 497-498.

"became aware of the situation regarding the fraud," and that "it had come to my attention that those payments were being made to a fraudulent company," and that he "became aware that there might be a problem with those invoices." *See, United States v. Grinage*, 390 F.3d 746, 751 (2d Cir. 2004)(vacating drug distribution conviction trial court improperly admitted agent's opinion testimony based on knowledge gained during investigation); *Rea*, 958 F.2d at 1216 ("When a witness has not identified the objective bases for his opinion, the proffered opinion obviously fails completely to meet the requirements of Rule 701.").

This testimony also did not meet the second requirement. This Court has said, "lay opinion testimony will fail this second 'helpfulness' requirement when the jury can readily draw the necessary inferences and conclusions without the aid of the opinion." *United States v. Sanabria*, 645 F.3d 505 (1st Cir. 2011).

While lay opinion testimony "is not [automatically] objectionable just because it embraces an ultimate issue," (Fed. R. Crim. P. 704(a)), "the Rule does not countenance 'the admission of opinions which would merely tell the jury what result to reach.'" *United States v. Reda*, 787 F.3d 625 (1st Cir. 2015), citing, Fed. Rule Evid. 704 Advisory Committee Note on 1972 Proposed Rules.

The trial court abused its discretion by permitting the government to elicit

repeat testimony that was improper the first time it was presented, after Mr. Legassa objected.

> **B.    The Trial Court's Error in Admitting This Testimony Was Not Harmless.**

This testimony went to the heart of the government's case, and it may well have affected the jury's verdict. *See, United States v. Kilmartin*, 944 F.3d 315 (1st Cir. 2019)("[a]n [evidentiary] error will be treated as harmless only if it is `highly probable' that the error did not contribute to the verdict," quoting *United States v. Fulmer* 108 F.3d 1486 (1997).  The facts regarding the registration of Alley CT and the opening of a bank account in its name by Mr. Legassa; the invoices, checks, instructions to send payment to the Connecticut address; and the amounts that were deposited to Alley CT's Santander account were undisputed.  The only question was whether this was something that Mr. Guilbault and Mr. McGrail were aware of and had agreed to or whether Mr. Legassa tricked them into making the payments to Alley CT.  There were weaknesses in the government's case, which rested in large part on the credibility of Mr. Guilbault and Mr. McGrail.  Mr. Guilbault repeatedly denied statements he had made in emails about how important Mr. Legassa was to NESN and what would happen if they lost him, until he was confronted with those emails.  R. 432-437.  Even then, he resisted taking

ownership of his own statements.[3]  For his part, Mr. McGrail gave overly

expansive, hyperbolic answers to questions throughout his testimony in an obvious

effort to bolster the government's case, drawing a response from the trial court that

eventually became very direct.[4]  By permitting Mr. Guilbault to testify to the

conclusion that Mr. Legassa had defrauded NESN, the court allowed the

government's lead witnesses to portray himself and NESN as victims, and to make

the government's argument from the witness stand.

The objective evidence also undermined the testimony of these two

witnesses.  From the very beginning, the checks to Alley were in amounts that far

exceeded the schedule set forth in Alley NY's first SOW.  According to Mr.

Guilbault's testimony, he paid no attention to anything about the checks, signing

them without a thought because he trusted Mr. Legassa.  But the FIDESEC system,

with its approval limits, was designed to prevent this type of rubberstamp approval

by sending checks that exceeded the approval limit for review by Mr. Guilbault.

---

[3]  When confronted with his March 13, 2021 email to Mr. McGrail (R. 1151-1152),
saying that the two of them had created the situation Mr. Legassa had complained
about, Mr. McGrail responded, "[y]es. . . that's what it says in the email."
Q:     That's what you said in the email.
A:     Yes, that's what I said in that -- in the email, yes.
R. 436:16-23.

[4]  The court told Mr. McGrail: "[t]he job here is not to tell your story. The job here
is to answer her questions, and then you'll answer his questions, and then you
might answer her questions again." R. 713:12-17.

The first two checks to Alley CT were well over that limit. Regardless of whether the address was noticed, Mr. Guilbault and Mr. McGrail signed two consecutively-numbered checks[5] to Alley on one day (June 15, 2021). Based on Mr. Guilbault's testimony that he signed checks in batches once a week, the two checks would have been signed together in one batch.

The jury heard Mr. Guilbault testify that Mr. Legassa had defrauded NESN not once, but several times. That testimony went to the heart of the government's case, and it was amplified by Mr. Guilbault's later testimony (though stricken) that a side agreement would have been unethical and illegal. It was further echoed by Mr. McGrail's testimony two days later (also stricken) in the following exchange:

Q:     When did [Mr. Legassa] work for NESN?

A:     He worked for NESN from September of '19 until January of '22, when we Discovered he had stolen --

R. 698:17-19.

Given the repetition of the improper "fraud" and related testimony and the questionable credibility of the government's witnesses, it cannot be said that it is highly probable that the error did not affect the verdict.

---

[5]  These checks were numbered 124221 and 124222. R. 957, 969.

II.     THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT
        PERMITTED THE GOVERNMENT TO  PRESENT TESTIMONY
        REGARDING MR. LEGASSA'S CREDIT CARD EXPENDITURES,
        INCLUDING SPECIFIC PURCHASES, AND TESTIMONY
        REGARDING TWO TRANSFERS OF FUNDS FROM THE LEGASSAS'
        JOINT ACCOUNT TO ACCOUNTS OWNED BY NILDA LEGASSA ON
        JANUARY 7 AND 10, 2022.

### Standard of Review

When an objection is made to an evidentiary ruling by the district court and

the issue is preserved for appeal, the court's evidentiary rulings are reviewed for

abuse of discretion. *United States v. Rodriguez*, 115 F.4th 24 (1st Cir. 2024).  An

abuse of discretion may be found where in improper factor is "accorded significant

weight," or there is a "palpable error of judgment in calibrating the decisional

scales."  *United States v. Santana-Avilés*, 120 F.4th 7 (1st Cir. 2024).

A.     The Trial Court Abused its Discretion When it Permitted
       the Government to Present Testimony Regarding
       Purchases on Mr. Legassa's Credit Card.

The trial court's decision, over defense objection, to permit testimony about

the credit card purchases was an abuse of discretion.  Mr. Legassa's motion in

limine and his objection to Exhibit 165 preserved the issue for appeal.  The court's

ruling permitting witness testimony regarding the chart was definitive , and

counsel was therefore not obligated to object each time Ms. Curtain testified about

the credit card purchases. *See, United States v. Soler-Montalvo*, 44 F.4th 1, 13 (1st

Cir. 2022).

Ms. Curtin repeatedly mentioned the pool and pool shed, European travel, and aircraft-related expenses, with dollar figures provided in some instances. This testimony was irrelevant, excessive, and overkill; it served only to appeal to class prejudice. It also came against the backdrop of her testimony with repeated references to the Tesla and the Piper plane. Ms. Curtin had already testified to the total amount of the credit card purchases and the total payments on those purchases, and she had testified that she saw no vendor-related payments from the Santander account.

Expenditure evidence may be admissible to show motive where a defendant with no apparent source of income spends more money than can be otherwise explained. *United States v. Carbone*, 110 F.4th 361, 390 (1st Cir. 2024); *United States v. Appolon*, 695 F.3d 44, 60 (1st Cir. 2012)(defendant had no legitimate source of disposable income, so his expenditures of the money derived from the scheme were relevant to show motive).

Even when this type of evidence appears relevant, the district court must weigh the probative value of the evidence against its prejudicial effect pursuant to F.R.E. 403. If that latter substantially outweighs the former, the evidence is not admissible. *Carbone*, 110 F.4th at 388, "[c]ourts must be on guard to prevent the motive label from being used to smuggle forbidden evidence of propensity to the jury," quoting *Varoudakis*, 233 F.3d at 120.

Mr. Legassa was a highly paid employee at NESN.  He had a legitimate source of income.  He had purchased the Piper plane in May of 2020, with a down payment of $32,000, which was over half the purchase price. (Add. 28).  This was well before he registered Alley CT and opened the Santander bank account in its name. Add. 26.  He and his wife had bought the Tesla in March, 2020, with a down payment of $13,000. Add. 31-32.

The testimony highlighting specific credit card purchases was a blatant appeal to class prejudice, which was part of Mr. Legassa's objection to Exhibit 165.  With that issue clearly raised, the court abused its discretion by allowing the government to present this testimony with no limiting instructions. *United States v. Quattrone*, 441 F.3d 153, 187 (1st Cir. 2006)(while evidence of wealth can unduly prejudice jury deliberations, that evidence may be admitted "where other safeguards are employed such as limiting instructions or restrictions confining . . . references to that wealth).

The government's presentation of complicated financial information, with reference to eight different charts contained a great deal of irrelevant and prejudicial material.  That presentation included testimony about the total amount charged on Mr. Legassa's credit card, and the total of those charges paid from the various accounts.  Ms. Curtin's testimony also included that she had seen no payroll expenses, payroll taxes, or payments to vendors or engineers or developers.

R. 733:6-14.  Still, the trial court allowed the government's show to go on until it was clearly overkill.  At that point, the court excluded the chart because the jury had already heard testimony to the information contained in it.  Admitting the testimony with no limiting instruction was an abuse of discretion.

The error was not harmless.  The credit card purchases were highlighted in the government's opening statement (R. 33:16-25 - R. 34:1-17 ) and in its closing as well. R. 812.  It cannot be said with a high degree of confidence that the government's use of this evidence to appeal to class prejudice did not have a substantial effect on the jury verdict.  *United States v. Kilmartin*, 944 F.3d 315 (1st Cir. 2019); *United States v. Doe*, 860 F.2d 488 (1st Cir. 1988)(appeals to passion may constitute reversible error).

> B.     The Trial Court Abused its Discretion When it Permitted the Government to Present Testimony Regarding Two Transfers of Funds from the Legassas' Joint Savings Account to Accounts in Nilda Legassa's name on January 7 and 10, 2022.

The trial court's decision to admit Ms. Curtin's testimony regarding the January 2022 transfers of funds from the Legassas' joint savings account to his wife's checking account over defense objection was also an abuse of discretion. This evidence was offered after the court had already indicated that Ms. Curtin's testimony was "pushing the envelope," and the prosecutor had promised to sit down after introducing one more chart.

The court acknowledged that this evidence had little probative value, but admitted in nonetheless.

> [T]he underlying evidence is already in. I'm going to allow this and you can both make your arguments. I can't say that there isn't a potential relevance to the government's case, and then you can make the argument back and forth. I think there's a danger in the argument for the defendant, because while people, as a matter of practice, try to protect their assets, I don't think you have a right to try to disgorge -- hide your assets when you know -- you know, it's just a thing. It's not particularly helpful, but I am going to allow it in.

Add. 26: 12-22. The danger alluded to in this passage is part of the prejudicial effect of the testimony about the transfers. That testimony likely led the jury to believe that there was something improper about the transfer of funds, even though it was from a joint account, not the Alley CT Santander account and not any other account solely owned by Mr. Legassa, to Nilda Legassa's accounts. At a minimum, this testimony created the likelihood of confusion, as the jury did not hear testimony on the point discussed at sidebar: that Mr. Legassa was not on notice of NESN's lawsuit at the time of these transfers. Worse, there is a danger that this testimony led jurors to assume that there was something nefarious about the transfer of funds.

Once again, the trial court did not engage in the balancing test required under Rule 403. This evidence should have been excluded because its marginal, "potential" probative value was "substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issue, misleading the jury,

undue delay, wasting time, or needlessly presenting cumulative evidence." *United States v. Ramos-Baez*, 86 F.4th 28 (1st Cir. 2024); *United States v. Varoudakis*, 233 F.3d 113 (1st Cir. 2000).

The admission of this testimony was an abuse of discretion.  The error was not harmless, particularly given the backdrop of the government's extensive presentation of expenditure evidence.  And as with the credit card purchases, the government mentioned the funds transfers both in its opening and in its closing. (R. 33:16-25 - R. 34:1-17).  *United States v. Varoudakis,* 233 F.3d 113 (1st Cir. 2000). It cannot be said with a fair degree of assurance that the error did not have a substantial and injurious effect on the jury verdict. *Carbone*, 110 F.4th at 383.

<u>CONCLUSION</u>

For the reasons set forth above, the Judgment must be vacated.

RESPECTFULLY SUBMITTED

ARIEL LEGASSA
By His Attorney,


<u>/s/Leslie Feldman-Rumpler</u>
LESLIE FELDMAN-RUMPLER
ATTORNEY AT LAW
BBO# 555792
4 Cypress Street, Suite 7
Brookline, Massachusetts 02445
(617) 728-9944
Leslie@feldmanrumplerlaw.com

## Certificate of Compliance With Type-Volume Limit

Certificate of Compliance With Type-Volume Limit,
Typeface Requirements, and Type-Style Requirements

    1.  This document complies with the
because, excluding the parts of the document exempted by

    this document contains _____ words, **or**

    this brief uses a monospaced typeface and contains _____ lines of text.

    2.  This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

    this document has been prepared in a proportionally spaced typeface using _____ in _____, **or**

    this document has been prepared in a monospaced typeface using _____ with _____.

(s) _____

Attorney for _____

Dated: _____

# CERTIFICATE OF SERVICE FORM FOR ELECTRONIC FILINGS

I hereby certify that on 2/17/2025, I electronically filed the foregoing document with the United States Court of Appeals for the First Circuit by using the CM/ECF system. I certify that the following parties or their counsel of record are registered as ECF Filers and that they will be served by the CM/ECF system: AUSA Donald Lockhart, United States Attorney's Office.

/s/Leslie Feldman-Rumpler
Counsel of Record for Ariel Legassa

38

# UNITED STATES COURT OF APPEALS
# FOR THE FIRST CIRCUIT

**Appeal No. 24-1209**

_____

## UNITED STATES OF AMERICA
**Appellee**

**v.**

## ARIEL LEGASSA
**Appellant**

_____

**On Appeal from a Judgment
of the
United States District Court
For the District of Massachusetts**

_____

## ADDENDUM OF THE
## DEFENDANT-APPELLANT

_____

**Respectfully submitted,**


**By his Attorney,**


**LESLIE FELDMAN-RUMPLER**
**Attorney-at-Law**
**4 Cypress Street, Suite 7**
**Brookline, MA  02445**
**(617) 728-9944**
**Leslie@feldmanrumplerlaw.com**

**February, 2025**

## INDEX TO ADDENDUM

1.    Judgment ............................................................Add. 1

2.    Transcript Excerpts, Trial Day Two (Doc. 141)
      October 31, 2023
      "Fraud" and Related Testimony .........................................Add. 8

3.    Transcript Excerpt, Pretrial Conference (Doc. 132)
      Re: Defendant's Motion in Limine (Doc. 111)
      October 20, 2023 .................................................Add. 16

4.    Transcript Excerpt, Trial Day Four (Doc. 143)
      Court's Ruling on Defense Objection
      November 2, 2023 .............................................Add. 26

5.    Exhibit 53
      Aircraft Loan Credit Application ......................................Add. 28

6.    Exhibit 56
      Tesla Loan Application, pp. 1, 6 .......................................Add. 31

7.    F.R.E. 701.................................................................Add. 31

8.    F.R.E. 704.................................................................Add. 32

9.    F.R.E. 403.................................................................Add. 33

10.   F.R.E. 1006..............................................................Add. 34

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 1

# UNITED STATES DISTRICT COURT
### District of Massachusetts

| | |
|---|---|
| UNITED STATES OF AMERICA | **JUDGMENT IN A CRIMINAL CASE** |
| v. | |
| ARIEL LEGASSA,<br>Defendant. | Case Number:  1:22-cr-10038-IT-1 |
| | USM Number:  84414-509 |
| | E. Peter Parker |
| | Defendant's Attorney |

## THE DEFENDANT:

☐ pleaded guilty to count(s)

☐ pleaded nolo contendere to count(s)
   which was accepted by the court.

☑ was found guilty on count(s)   1-7, 8-10
   after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. § 1341 | Mail Fraud | 4/1/2021 | 1 |
| 18 U.S.C. § 1341 | Mail Fraud | 4/27/2021 | 2 |

The defendant is sentenced as provided in pages 2 through _____7_____ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s)

☐ Count(s) _____ ☐ is ☐ are dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

2/27/2024
Date of Imposition of Judgment

*Indira Talwani*
Signature of Judge

Indira Talwani, U.S. District Judge
Name and Title of Judge

2/29/2024
Date

**Add. 1**

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
Sheet 1A

DEFENDANT: ARIEL LEGASSA,Defendant.
CASE NUMBER: 1:22-cr-10038-IT-1

Judgment—Page ___2___ of ___7___

## ADDITIONAL COUNTS OF CONVICTION

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. § 1341 | Mail Fraud | 6/15/2021 | 3 |
| 18 U.S.C. § 1341 | Mail Fraud | 6/24/2021 | 4 |
| 18 U.S.C. § 1341 | Mail Fraud | 8/24/2021 | 5 |
| 18 U.S.C. § 1341 | Mail Fraud | 10/5/2021 | 6 |
| 18 U.S.C. § 1341 | Mail Fraud | 11/23/2021 | 7 |
| 18 U.S.C. § 1957 | Money Laundering | 4/16/2021 | 8 |
| 18 U.S.C. § 1957 | Money Laundering | 5/11/2021 | 9 |
| 18 U.S.C. § 1957 | Money Laundering | 10/4/2021 | 10 |

**Add. 2**

AO 245B (Rev. 09/19) Judgment in Criminal Case
Sheet 2 — Imprisonment

DEFENDANT:  ARIEL LEGASSA,Defendant.

Judgment — Page ___3___ of ___7___

CASE NUMBER:   1:22-cr-10038-IT-1

## IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:
42 months on each count to be served concurrently.

☑ The court makes the following recommendations to the Bureau of Prisons:
The court recommends defendant be designated to a facility commensurate with his security level that is near Burlington, Connecticut.

☐ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

　☐ at _____    ☐ a.m.   ☐ p.m.   on _____.

　☐ as notified by the United States Marshal.

☑ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

　☑ before 2 p.m. on   4/8/2024 _____.

　☐ as notified by the United States Marshal.

　☐ as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

at _____, with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

**Add. 3**

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 3 — Supervised Release

DEFENDANT:  ARIEL LEGASSA,Defendant.
CASE NUMBER:  1:22-cr-10038-IT-1

Judgment—Page    4    of    7

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of:

3 years on each count to be served concurrently.

## MANDATORY CONDITIONS

1.  You must not commit another federal, state or local crime.
2.  You must not unlawfully possess a controlled substance.
3.  You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
      ☑ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*
4.  ☑ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5.  ☑ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6.  ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7.  ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

**Add. 4**

AO 245B (Rev. 09/19)  Judgment in a Criminal Case
Sheet 3A — Supervised Release

DEFENDANT: ARIEL LEGASSA,Defendant.
CASE NUMBER: 1:22-cr-10038-IT-1

Judgment—Page   5   of   7

# STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1.  You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2.  After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3.  You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4.  You must answer truthfully the questions asked by your probation officer.
5.  You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6.  You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7.  You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8.  You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9.  If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.
13. You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature _____        Date _____

**Add. 5**

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
Sheet 3D — Supervised Release

DEFENDANT: ARIEL LEGASSA,Defendant.
CASE NUMBER: 1:22-cr-10038-IT-1

Judgment—Page ___6___ of ___7___

## SPECIAL CONDITIONS OF SUPERVISION

1. You must not knowingly have any contact, direct or indirect, with any witnesses in this matter or the victim company or any of its employees.
2. You must pay the balance of any fine or restitution imposed according to a court-ordered repayment schedule.
3. You are prohibited from incurring new credit charges or opening additional lines of credit without the approval of the Probation Office while any financial obligations remain outstanding.
4. You must provide the Probation Office access to any requested financial information, which may be shared with the Asset Recovery Unit of the U.S. Attorney's Office.

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
                       Sheet 5 — Criminal Monetary Penalties

DEFENDANT: ARIEL LEGASSA, Defendant.                    Judgment — Page    7    of    7
CASE NUMBER: 1:22-cr-10038-IT-1

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | Restitution | Fine | AVAA Assessment* | JVTA Assessment** |
|---|---|---|---|---|---|
| **TOTALS** | $ 1,000.00 | $ 580,500.00 | $ | $ | $ |

☐ The determination of restitution is deferred until _____. An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☑ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss*** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| NESN | | $5,000.00 | |
| Travelers Insurance and Surety Company | | $575,500.00 | |

| TOTALS | $        0.00 | $       580,500.00 | |
|---|---|---|---|

☐ Restitution amount ordered pursuant to plea agreement  $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

   ☐ the interest requirement is waived for the   ☐ fine   ☐ restitution.

   ☐ the interest requirement for the   ☐ fine   ☐ restitution is modified as follows:

* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
** Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
*** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

**Add. 7**

1   **A.** Yes, it does.

2   **Q.** And how do you know that?

3   **A.** Because I've reviewed them.

4          MR. SALTZMAN: The government offers Exhibit 156 in

5   evidence.

6          MR. PARKER: No objection.

7          THE COURT: 156 is admitted.

8          (Exhibit 156 admitted into evidence.)

9   BY MR. SALTZMAN:

10  **Q.** So, Mr. Guilbault, in all, how many invoices were

11  submitting -- were submitted directing payment to Alley

12  Interactive with a Connecticut address?

13  **A.** Eleven.

14  **Q.** And what was the total amount that NESN paid pursuant to

15  those invoices?

16  **A.** $575,500.

17  **Q.** And the last two invoice dates, there are three stars

18  next to them. Do you see that?

19  **A.** Yes, I do.

20  **Q.** What happened to the invoices that have the three stars

21  next to them?

22  **A.** Those invoices were not paid.

23  **Q.** Why not?

24  **A.** Because I had put a stop payment on those two invoices

25  once I became aware of the situation regarding the fraud that

1   was perpetrated against the company.

2   **Q.**  By whom?

3   **A.**  Mr. Legassa.

4   **Q.**  All right.  So we're going to return to that a little bit

5   later, but before that, I want to ask you a little bit more

6   about these invoices.

7           So when was the first invoice submitted?

8   **A.**  The invoice date is March 4, 2021.

9   **Q.**  And when was the master services agreement and the first

10  statement of work entered into between NESN and Alley

11  New York?

12  **A.**  Right around that time.

13          MR. SALTZMAN:  So can we have, please,

14  Ms. Hallagan, Exhibit 11, that's in evidence.

15  BY MR. SALTZMAN:

16  **Q.**  So, Mr. Guilbault, do you recognize this document?

17  **A.**  Yes, I do.

18  **Q.**  And what is it?

19  **A.**  This is an invoice from Alley Connecticut to NESN.

20  **Q.**  And what's the logo on that -- on the top right?

21  **A.**  That is the Alley New York corporate logo.

22  **Q.**  And what is the date and amount of the invoice?

23  **A.**  The date is March 4, 2021 and the amount is $85,000.

24  **Q.**  So we just reviewed the -- Exhibit 156 that lists all the

25  payments.  Where does this rank in the timeline of those --

1    properly by Mr. Legassa, the work was being done as it was

2    supposed to be done, and in his capacity as vice president,

3    officer of the company, he wanted us to make those payments

4    because those were appropriate payments.

5    **Q.**  So let's go to January of 2022.

6            MR. SALTZMAN:  And if we could pull up Exhibit 156,

7    again, please.

8    BY MR. SALTZMAN:

9    **Q.**  I want to turn to those last two payments, the ones with

10   the stars next to them.

11   **A.**  Yes.

12   **Q.**  So can you just remind everyone, what happened with those

13   last two payments?

14           MR. PARKER:  I'm going to object, Your Honor.

15           THE COURT:  Can you reframe the question?

16   BY MR. SALTZMAN:

17   **Q.**  Yes.  What happened to the last two payments, the last

18   two invoices?

19   **A.**  I instructed accounting to stop payment on those

20   invoices.

21   **Q.**  And why did you make that instruction?

22           MR. PARKER:  Objection.  Can I be heard?

23           THE COURT:  You may.

24           (Beginning of sidebar.)

25           MR. PARKER:  I have two objections.  One is asked

**Add. 10**

1   and answered, but the first time that he asked the witness

2   this question, the witness gave basically a legal opinion

3   that he stopped the payments because fraud was perpetrated on

4   the company by Mr. Legassa, and I don't think that's an

5   appropriate answer for the witness.

6            THE COURT:  Are you --

7            MR. PARKER:  I think that's for the jury to find.

8            THE COURT:  Are you objecting to an answer that

9   happened earlier in the testimony?

10           MR. PARKER:  I didn't object the first time around.

11           THE COURT:  So that one's past.  What's the current

12   issue with the question that was just asked?

13           MR. PARKER:  Asked and answered and I don't want

14   them to do it again.  I should have objected the first time

15   around.

16           THE COURT:  So if you can limit your question -- I

17   don't think he answered.  At least, I don't think he made

18   that legal conclusion the second time.  If you can, counsel,

19   ask your question in a more limited way, because we don't

20   need him to testify to the final conclusion.

21           MR. SALTZMAN:  Understood, Your Honor.

22           (End of sidebar.)

23   BY MR. SALTZMAN:

24   Q.  Mr. Guilbault, just focusing on what you did at the time

25   and not -- and not characterize it, but just focusing on what

**Add. 11**

1  you did, you mentioned that you canceled payment on these

2  last two checks.  What was it about these two invoices that

3  led you to cancel payment?

4  **A.**  It had come to my attention that those payments were

5  being made to a fraudulent company.

6          MR. PARKER:  Objection.

7          THE COURT:  Okay.  So I'm going to instruct you --

8  I think if you keep the adjectives out and just stick to what

9  specifically happened, or didn't happen.

10          THE WITNESS:  So I instructed accounting not to

11  make those payments when I became aware that there might be a

12  problem with those invoices.

13  BY MR. SALTZMAN:

14  **Q.**  What was the -- without -- and just focusing on the

15  facts, what was the problem?

16  **A.**  Those payments would have been made to a company

17  controlled by Mr. Legassa.

18  **Q.**  And what was the problem with doing that?

19  **A.**  That was not a legitimate vendor.

20  **Q.**  What was your reaction when you found out that that

21  company, Alley Interactive, was incorporated by the

22  defendant, Ariel Legassa?

23          MR. PARKER:  Objection.

24          THE COURT:  I'm going to allow it.  Go ahead.

25          THE WITNESS:  I was -- quite honestly, I was -- I

**Add. 12**

1   this.

2           MR. SALTZMAN:  Maybe -- if the witness can say

3   that, because it's his testimony.

4           THE COURT:  So why don't you ask --

5           MR. SALTZMAN:  Yeah.

6           THE COURT:  -- a question that doesn't get into

7   the -- the problem here is that we don't want to have really

8   anything more than your observations and recounting of the

9   specifics and we don't want your sort of conclusions as to

10  why things happened.

11          So to the extent that you can give us something

12  without getting too far down the analysis of it, that would

13  be great.

14          THE WITNESS:  Do I speak now or he's --

15          THE COURT:  He should ask a question.

16          THE WITNESS:  Okay.

17          MR. SALTZMAN:  All right.

18  BY MR. SALTZMAN:

19  **Q.**  So without getting into the fine print or the details,

20  but just stepping back from 30,000 feet, why did NESN fire

21  Mr. Legassa at that time?

22  **A.**  Because he had violated the responsibilities of his role.

23  **Q.**  Okay.  Did NESN pursue civil litigation against Legassa?

24  **A.**  Yes, they did.

25  **Q.**  And were you involved in that process?

1   existing NESN vendor?

2   **A.**  Absolutely not.

3   **Q.**  Did you agree to pay Mr. Legassa more money through this

4   business in Connecticut, Alley Interactive?

5   **A.**  No, I did not.

6   **Q.**  Did Mr. McGrail agree to this?

7   **A.**  No, he did not.

8   **Q.**  Would you ever agree to something like this?

9           MR. PARKER:  Objection.

10          THE COURT:  Sustained.

11  BY MR. SALTZMAN:

12  **Q.**  Why didn't you agree to any of this?

13          MR. PARKER:  Objection.  Same reason as -- same

14  concern as before, Your Honor.

15          THE COURT:  I'm sorry; I didn't understand the

16  question, so --

17          MR. SALTZMAN:  Sure.  I can try to rephrase the

18  question.

19  BY MR. SALTZMAN:

20  **Q.**  So I had asked you before whether you had agreed to pay

21  Mr. Legassa through this, through the business that he

22  incorporated, Alley Connecticut, and you said no.  And my

23  question is, why would you not have agreed to something like

24  that?

25          MR. PARKER:  Objection Your Honor.  I have the same

1   concerns as before.

2           THE COURT:  I'm going to allow that question.

3           THE WITNESS:  Because it would be unethical and

4   illegal --

5           MR. PARKER:  Objection, Your Honor.

6           THE WITNESS:  -- to pay --

7           THE COURT:  So there's an objection.  You have to

8   stop talking when he says there's an objection.

9           THE WITNESS:  I apologize, Your Honor.

10          THE COURT:  So I -- I think the "why" question is

11  too broad.  So I'm going to have you -- strike the answer

12  there.  You can ask a follow-up question, but it needs to be

13  a little more narrow than that.

14  BY MR. SALTZMAN:

15  **Q.**  During your time at NESN, did you ever agree to pay any

16  employee through a side deal?

17  **A.**  No.

18          MR. SALTZMAN:  May I have one moment, Your Honor?

19          THE COURT:  Uh-huh.

20          MR. SALTZMAN:  No further questions, Your Honor.

21          MR. PARKER:  May I begin, Your Honor?

22          THE COURT:  Yes, you may.

23          **CROSS-EXAMINATION BY COUNSEL FOR THE DEFENDANT**

24  BY MR. PARKER:

25  **Q.**  Good afternoon, Mr. Guilbault.

**Add. 15**

 1    revisit this issue.  Depending upon how the evidence comes in

 2    and depending upon Mr. Parker's cross-examination of other

 3    witnesses, that will inform how we view redactions and how to

 4    treat the recorded transcript.  So I think --

 5              THE COURT:  Okay.

 6              MR. SALTZMAN:  -- for these purposes, there's

 7    nothing to do, and we can see how the case evolves.

 8              THE COURT:  Okay.  I'm treating it as moot as to

 9    the case in chief, and if Mr. Legassa testifies, we'll

10    re-address what we have to deal with.

11              Okay.  Where are we on the personal information in

12    the credit card bank and loan records and --

13              MS. QUEENIN:  So it was defense counsel's motion,

14    but to the extent I could narrow the issue, I'm happy to do

15    that first.

16              So we have conferred with defense counsel multiple

17    times about this issue.  I understand the issue to be that

18    the defense has an unidentified concern with respect to

19    credit card records.  We have raised that if there's a

20    specific transaction where someone's purchasing something

21    that's inflammatory or sensitive, we're happy to discuss it,

22    but those have not be identified.

23              We've also informed defense counsel that we

24    actually don't plan to enter into evidence the underlying

25    credit card records.  We plan to use summary charts to

1   summarize the credit card records because they are

2   voluminous.  There are multiple cards.  And we don't plan to

3   highlight at this point specific purchases on those cards as

4   opposed to the volume of purchases.

5          We have comitted to providing the defense with our

6   summary charts before the trial begins.  The underlying

7   evidence is all stipulated to as admissible.  And the summary

8   charts summarize voluminous information, so I think the

9   credit card portion of this is a moot issue, with the caveat

10  that if the defendant testifies or his wife or daughter is to

11  testify, there are specific records that we may go into on

12  cross-examination of those witnesses.  But for the purpose of

13  our case in chief, we're not seeking to enter into evidence

14  Amex records that have someone's date of birth, Social

15  Security number, et cetera.

16         MR. PARKER:  So I want to just address one thing

17  that Ms. Queenin just said, that we've stipulated to

18  admissibility of all the underlying records.  We haven't.

19  We've stipulated as to authenticate.

20         MS. QUEENIN:  Sorry.  I misspoke.

21         MR. PARKER:  So there's that.

22         Second, Your Honor, there are thousands of pages of

23  records from credit cards, loans, whatnot.  Okay?  It doesn't

24  go -- it goes far beyond "On such and such a day, somebody

25  purchased a sex toy," or something embarrassing.  Okay?

Add. 17

1    These --

2          THE COURT:  Is there anything embarrassing that

3    we're concerned about?

4          MR. PARKER:  I haven't gone line by line through

5    every piece of it.  My position is that it's not -- two years

6    of Amex statements are not relevant.  Okay?  What is relevant

7    here is NESN paid money into a Santander Bank account opened

8    by Alley.  So the Santander Bank records come in.  From

9    there, money went to pay off personal loans, it went --

10   directly from Santander or other personal things.

11         Other monies went to a joint bank account that was

12   in the name of Mr. Legassa and his wife.  Things went out

13   from that account.  Other money also went into that account.

14   She worked.  Her paychecks were direct deposited into it.

15         So putting in two years of every credit card

16   statement --

17         THE COURT:  So they just said they'd do a summary.

18         MR. PARKER:  Right.  And I haven't seen the summary

19   charts.

20         THE COURT:  Okay.  So assuming that the summary

21   chart ends up being acceptable, is there any problem?

22         MR. PARKER:  Well, from what's been described, it's

23   hard to say that without saying -- seeing them.  And

24   Ms. Queenin has represented she doesn't think she can get

25   those to me, I think, until Friday of next week, which is the

1    day before we start trial.

2              THE COURT:  But --

3              MR. PARKER:  But --

4              THE COURT:  -- it's hard to understand what the

5    concern is --

6              MR. PARKER:  Okay.

7              THE COURT:  -- with the summary.  I hear that

8    you're sort of saying, well, I don't want individual

9    purchases.  I don't want them to look at "Am I buying this or

10   am I buying that?"

11             But if they have a chart saying this is the money

12   that went out, this is the money that went in, is there a

13   problem about that that I'm not understanding?

14             MR. PARKER:  Well, here's the problem, and it's

15   kind of a nuance, Your Honor.  From what Ms. Queenin has told

16   me, the summary chart is going to say something like this is

17   how much the Legassa family spent on restaurants during this

18   time period.  This is how much the Legassa family spent on

19   home improvements during this time period.  This is how much

20   the Legassa family spent on travel during this time period.

21             I don't think how they spent their money is --

22   specifically how they spent their money -- is relevant.  It's

23   relevant whether they -- all of the money that came from

24   NESN, or however much of the money that came from NESN, was

25   used to pay personal expenses and was not used to pay vendors

**Add. 19**

1    or other service providers or anything like that.

2         They can do this in a much more narrow and focused

3    way saying here's all the money into the Santander Bank

4    account.  He's the money out.  And there's -- you know, their

5    agents have gone through every line of every one of these

6    accounts.

7         Their agents can say all of the money that went

8    into these accounts was used to pay off loans, credit cards,

9    and personal expenses.  And why does the summary chart have

10   to say they spent X thousands of dollars on dinner at

11   restaurants or X thousands of dollars on home improvements?

12        The image that the government wants to create is

13   here's a family living high on the hog because they just had

14   this windfall.  And I think it's -- it's not necessary to go

15   that far.  It's legitimate to say how much money came into

16   the Santander Alley bank account, how much went out, and

17   where it went.  And there's nothing that anybody can find

18   that shows that it went to any vendor or anything like that,

19   and it all went to personal expenses.

20        MS. QUEENIN:  Your Honor, I understand this

21   discussion to be centered on the credit cards.  I think

22   there's separate issues surrounding other purchases that are

23   made out directly out of the bank account, but it is hard to

24   imagine a more clear relevance to this case than how the

25   stolen money was spent.

**Add. 20**

1      By the logic, every fraud case would involve vague

2  descriptions of -- that don't even go to motive, which the

3  government has the burden of proof to prove beyond a

4  reasonable doubt that this occurred.  A central part of that

5  is explaining to the jury what this defendant's motive was in

6  stealing the money.

7      And so to the extent that we are able to show

8  through the records -- and, again, with respect to the credit

9  cards, not highlighting that he went to Capital Grille on

10  this date and bought a steak, like "restaurants," I think

11  that is not an image the government is seeking to create;

12  that is factual based on the underlying bank records.

13      And the -- the notion that that type of evidence in

14  a financial fraud case is irrelevant is preposterous.  We are

15  entitled to present that.  And, frankly, we were trying to be

16  accommodating by presenting it through charts as opposed to

17  highlighting individual purchases.  And I thought a long time

18  before I made that concession with respect to the credit

19  cards, because we are entitled to show individual purchases.

20      And I know I said at the beginning I'm speaking

21  about the credit cards, but I just want to be clear for the

22  record there are other individual purchases that we do intend

23  to show, including payoff of vehicles, which show the

24  defendant was living beyond his means with large amounts of

25  loans, which, again, goes to motive, which is the central

```
 1    issue and thing that we have to explain to the jury.

 2            And so, respectfully, Your Honor, if it's relevant

 3    that there are these vague allegations that the defendant

 4    alleges occurred about an alleged racist comment with no date

 5    and no specifics, this is central to our case and is highly

 6    relevant, and we are entitled to present evidence on it.

 7            THE COURT:  Anything you want to say on this one?

 8            MR. PARKER:  So I'm glad that Ms. Queenin drew that

 9    distinction, because there are a lot of things.  There's a

10    loan on a Tesla, and they're going to put it in.  And there's

11    a loan on an airplane, and they're going to put it in.

12            But, you know, it's not just credit card

13    statements; it's bank statements, because nobody uses cash.

14    So everything they do is on a debit card on a bank statement.

15    And I -- you know, Mr. Legassa's daughter has a card on one

16    of these accounts, and her charges appear.  Ms. --

17    Mrs. Legassa, Nilda Legassa, his wife, it's a joint bank

18    account.  So all of her expenses appear.

19            And if it's "He paid off the credit card," I don't

20    know why the credit card statements, other than the balance

21    and the payments, need to come in.

22            THE COURT:  So I think this is where we are.  I

23    don't think you have articulated grounds to keep this

24    information out.  If there are specific items of privacy

25    concerns, we can figure out how to deal with those.
```

```
 1          I'd recommend that you work out how you want to
 2    label things on a summary chart and move along those lines to
 3    protect the family's privacy if you'd like to do that.  But I
 4    don't -- I think they're entitled to do it and put the
 5    material in.
 6          So you can come back to me with some -- if you
 7    aren't able to work this out and there's some specific
 8    transactions you would like me to shield from the view of the
 9    jury, we can go through and redact those, but -- as
10    appropriate -- but I'm -- I think they're allowed to make
11    this argument.
12          MR. PARKER:  Okay.  I mean, just to give the Court
13    a heads-up on where we're at on that, I just sort of finally
14    got around to being able to look at the long summary charts,
15    and it kind of surprised me.  And I thought that the
16    underlying records had to come into evidence.  I think the
17    government's right that they don't.  And if they're
18    representing that they're not going to put them in and we're
19    just going to fight over what's on summary charts, I'm happy
20    with that.
21          THE COURT:  So I think where we are is that they
22    have a right to put it in.  It is probably in everyone's
23    interest to use summary charts.
24          As to the summary charts, if they're accurate, I
25    think they get to go in.  If someone is trying to make the
```

**Add. 23**

```
 1    summary chart using titles that aren't accurate, I will -- I
 2    will not permit that.  But if they're accurate, simply
 3    because they're not -- you know, it looks like a big expense
 4    on this item, that's not a reason for me not to let them do
 5    it.
 6             So my recommendation is you try to work it out so
 7    that they can convey what they need to convey without any
 8    undue embarrassment for individual things people may have
 9    been done.
10             MS. QUEENIN:  I just want to say for clarity,
11    Your Honor, and I know we've belabored this point, but with
12    respect to the credit cards, we're not expecting to put in
13    any underlying records, except, potentially, if the defendant
14    or his wife testifies.  We may do so on cross-examination,
15    because we don't know if they're testifying.  We'll have
16    limited time to prepare.  I don't think we'll have time to
17    prepare summary charts.
18             And with respect to the other expenses, there are
19    specific charged wires in this case.  We may show underlying
20    wire documentation just because I don't like the jury to see
21    that on a summary chart only.
22             And with respect to some of the other loan
23    documentation -- so, for example, paying off the plane, the
24    private plane loan and the Tesla loan -- we may show that
25    documentation briefly, not to -- I don't want the jury
```

```
 1    spending five hours on this either.  They're going to be
 2    bored if I'm doing that, but we may show it briefly to just
 3    have the financial analyst explain how they concluded what
 4    the payment was for and who it was for.
 5              So I just wanted to be clear on the record for
 6    that.  We are not planning on putting in the credit card
 7    statements, which is the only thing I had initially
 8    understood the defense was objecting to.
 9              MR. PARKER:  I have nothing to add.
10              THE COURT:  Okay.  And then the last motion in
11    limine, I believe, was unopposed.  That was Government 115,
12    evidence and argument related to NESN's insurance payments.
13              MR. SALTZMAN:  It is unopposed, Your Honor.  I'm
14    happy to be heard, if Your Honor --
15              THE COURT:  No, I would allow it.  It's unopposed,
16    and it seems to make sense we won't have argument or
17    cross-examination about insurance reimbursement.
18              Anything else on that from defendants?
19              MR. PARKER:  No.  I haven't been able to find
20    anything that can get it in, so --
21              THE COURT:  Okay.
22              MR. PARKER:  -- I think that's right.
23              THE COURT:  That one is allowed.
24              Okay.  The next -- so on the proposed jury
25    instructions, the reason I asked for the jury instructions in
```

**Add. 25**

1   people don't get served right away.  And it's my memory that

2   the case got filed initially by NESN -- I might have the date

3   of that, if I had a couple of minutes here -- but not served,

4   and it didn't get served because NESN sought ex-parte

5   prejudgment attachments.

6           So Mr. Legassa, when he made this transfer, didn't

7   even have notice of a civil suit.  All he knew is that he had

8   been fired by NESN the day before.

9           MR. SALTZMAN:  But he had been fired for the exact

10  same conduct that is the subject of our case, of the federal

11  prosecution.  The facts are --

12          THE COURT:  So the evidence -- the underlying

13  evidence is already in.  I'm going to allow this and you both

14  make your arguments.  I can't say that there isn't a

15  potential relevance to the government's case, and then you

16  can make the argument back and forth.

17          I think there's a danger in the argument for the

18  defendant because while people, as a matter of practice, try

19  to protect their assets, I don't think you have a right to

20  try to disgorge -- hide your assets when you know -- you

21  know, it's just a thing.  It's not particularly helpful, but

22  I am going to allow it in.

23          With regard to the other exhibit, I really think we

24  should move on.  She's -- you've got all of this detail.

25  You've got the words in, and I'm going to reconsider, despite

**Add. 26**

1  all the work your office has now done, and not have that

2  chart on the credit card payments go to the jury.  They have

3  the testimony on the big items and it's really overly --

4  it's --

5          And in light of the slippage -- which I do blame

6  Mr. Parker for not having called this to your attention so we

7  could have prepared the witness better; but, nonetheless, I

8  don't think we need to go back and bring that chart in, but I

9  will allow this chart -- I will allow this line of inquiry

10 here now.

11         MR. SALTZMAN:  Okay, Your Honor.

12          (End of sidebar.)

13         MR. SALTZMAN:  If we can have Exhibit 68, page 101

14 back up, please.

15 BY MR. SALTZMAN:

16 Q.  And before we broke, Ms. Curtin, the question I had put

17 to you was what happened in the prime share account -- what

18 is prime share?  What does that mean?

19 A.  It's a savings account.

20 Q.  What happened in the savings account between January 7th

21 and January 10th?

22 A.  On January 7th, there was a transfer of about $22,000 to

23 the home equity line of credit, and then on January 10th,

24 there was a transfer to Nilda Legassa's savings account at

25 the credit union.

**Add. 27**

# AIRCRAFT LOAN CREDIT APPLICATION & FINANCIAL STATEMENT



**DORR AVIATION**
CREDIT CORPORATION, LLC

579 Pleasant Street, Suite 4 · Paxton, MA 01612
Tel: (800) 214-0066 · Fax: (508) 363-1700
E-Mail: Apply@dorraviation.com

**PLEASE COMPLETE ALL FIELDS ACCURATELY**

To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify and record information that identifies each person who opens an account.

**WHAT THIS MEANS FOR YOU:** When you open a credit account with a lending institution, we will ask for your name, address, date of birth, and other information that will allow us to identify you. We may also ask to see your driver's license or other identifying documents.

## AIRCRAFT AND LOAN DETAIL

| Aircraft Year | Aircraft Make | Aircraft Model | Serial Number | N-Number | Base Airport Identifier |
|---|---|---|---|---|---|
| 1972 | PIPER | PA-28R-200 | 28R-7335039 | N15229 | 4B8 |

| Purchase Price | Loan Amount Requested | Loan Term (Yrs.) | Down Payment | Reason For Loan |
|---|---|---|---|---|
| 62,000 | 30000 | 72 | 32,000 | ☑ Purchase  ☐ Dorr Refinance  ☐ Other Refinance  ☐ Other |

| Name in which aircraft is to be registered | Business Entity Type | Type of Operation |
|---|---|---|
| KAULIKE LLC | ☑ LLC  ☐ Sub-S Corp  ☐ C-Corp | ☐ Part 91  ☐ Part 135  ☐ Part 14 |

## PERSONAL AND CREDIT INFORMATION

| Name of Applicant | | Social Security Number | Date of Birth | Are you a US Citizen? |
|---|---|---|---|---|
| ARIEL LEGASSA | ☑ Applying Singly | | | ☑ Yes  ☐ No |

| Name of Co-Applicant (if spouse) | | Social Security Number | Date of Birth | Are you a US Citizen? |
|---|---|---|---|---|
| | ☐ Applying Jointly | | | ☐ Yes  ☐ No |

| Street Address | City | State | Zip Code | Home Phone | Work Phone (w/ext.) | Cell Phone |
|---|---|---|---|---|---|---|
| | | CT | | | | |

| Years at Address | | Purchase Price | Original Mortgage | Mortgage Balance | Payment/Rent | Lender/Landlord—Name & Phone |
|---|---|---|---|---|---|---|
| 6 | ☑ Own ☐ Rent | 420000 | 300000 | 250000 | 2500 | DRCOOPER |

| Applicant's Employer—Name & Address | | Position | How Long? | Mo. Salary |
|---|---|---|---|---|
| NESN | | VP of Digital | 1 YR | 25,000 |

| Co-Applicant's Applicant's Employer—Name & Address | | Position | How Long? | Mo. Salary |
|---|---|---|---|---|
| | | | | |

| Other income and Source (alimony, child support and/or separate maintenance income need not be revealed if you do not wish to have it considered as a basis for repaying this obligation) | Do you have a will? |
|---|---|
| | ☐ Yes  ☑ No    If Yes, name of executor |

| Are you a partner or officer in any other venture? (if so, describe) | Are you a defendant in any legal action? (if so, describe) |
|---|---|
| NO | NO |

| Personal Bank and Account Info | Name & address of nearest relative not living with you | Relationship | Phone |
|---|---|---|---|
| ABE Credit Union | | Cousin | |

| Do you have any contingent liabilities? (if so, describe) | Have you ever been a debtor in a bankruptcy case or declared insolvent? | Do you have any alimony, child support or separate maintenance payments? |
|---|---|---|
| NONE | ☐ Yes  ☑ No    If Yes, when? | ☐ Yes  ☑ No    If Yes, monthly payment |

PAGE 1

EXHIBIT
053
22-CR-10038-IT

USAO_00001511

**Add. 28**

# AIRCRAFT LOAN CREDIT APPLICATION & FINANCIAL STATEMENT

☐ Check here if you have your own personal financial statement prepared (please attach)

## FINANCIAL STATEMENT

| ASSETS | IN DOLLARS | LIABILITIES | IN DOLLARS |
|---|---|---|---|
| Cash on Hand | 10,000 | Notes Payable to Banks – Secured (tied to an asset or collateral) | 0 |
| US Government & Marketable Securities | 0 | Notes Payable to Banks – Unsecured (not collateralized) | 0 |
| Non-Marketable Securities | 0 | Notes Payable to Others – Secured | 0 |
| Retirement Accounts | 25,000 | Notes Payable to Others – Unsecured | 0 |
| Partial Interest in Real Estate Securities (See Schedule Below) | 0 | Accounts and Bills Due | 0 |
| Real Estate Owned (See schedule Below) | 520000 | Unpaid Income Taxes | 0 |
| Loans Receivable | 0 | Real Estate Mortgages Payable (See Schedule Below) | 2500 |
| Autos and Personal Property | 150,000 | Other Debts – Itemize | |
| Cash Value of Life Insurance | 500,000 | Tesla 3 Loan | 900 |
| Other Assets – Itemize | | | |
| Wine Cellar (2,000 bottles) | 250,000 | | |
| | | | |
| TOTAL ASSETS | | TOTAL LIABILITIES | |
| | | NET WORTH | |
| | | TOTAL LIABILITIES AND NET WORTH | |

## REAL ESTATE SCHEDULE

| ADDRESS & TYPE OF PROPERTY | NAME ON TITLE | DATE ACQUIRED | COST | MARKET VALUE | MORT. BALANCE | MONTHLY PMT. |
|---|---|---|---|---|---|---|
| ▨ | Nilda Lorenzatto | 05-01-2014 | 420000 | 550000 | 250000 | 2500 |
| Cessna 172c | Ariel Legassa | 01-15-2017 | 26,000 | 35,000 | 0 | 0 |
| Tesla 3 | Ariel Legassa | 03-13-2020 | 70,000 | 70,000 | 60,000 | 900 |
| BMW 3 | Ariel Legassa | 07-01-2018 | 28,000 | 26,000 | 10,000 | 300 |
| | | | | | | |

I HEREBY MAKE APPLICATION FOR CREDIT. I authorize Dorr Aviation Credit Corporation, LLC (DACC) and/or the Lender to obtain on an ongoing basis such credit information as you may require concerning the statements made in this application and agree that the application shall remain property of DACC and/or the Lender whether or not the request is granted. I understand that if the Lender approves my request, a copy of the appropriate agreement form(s) stating the terms of the agreement(s) with the Lender will be furnished to me.

I ACKNOWLEDGE I HAVE READ THE REVERSE SIDE NOTICE TO APPLICANTS. DACC IS AN EQUAL OPPORTUNITY LENDER. I certify that the foregoing statements and representations are true in every respect to the best of my knowledge and belief, and are made for the purposes of obtaining credit and under the penalty of perjury.

05/07/20

APPLICANT'S SIGNATURE _____ DATE _____    CO-APPLICANT'S SIGNATURE _____ DATE _____

SC-MO100406

PAGE 2

USAO_0000151

**Add. 29**

  | STRATEGIC PARTNER

Customer No.    01373616
Certificate No.    A-000079830

# CERTIFICATE of INSURANCE

This certificate is issued to

Mahopac Bank ISOA/ATIMA
Loan Servicing Department
Po Box 6569
Ithaca, NY 14851

| On behalf of Named Insured | Ariel Legassa |
| --- | --- |
| Insurer | Old Republic Aerospace, Inc. |
| Issuing Insurer Policy No. | PB 21683101 |
| Policy Period | May 18, 2020 to May 18, 2021 |

| Insured Aircraft | Coverage | Limits of Liability |
| --- | --- | --- |
| 1972 PIPER PA-28R-200, N15228 Serial Nos.: 28R-7335039 | Single Limit Bodily Injury & Property Damage Liability | $1,000,000 each occurrence limited to $100,000 per passenger |
| | Aircraft Physical Damage | $64,500 insured value Ground and Flight |

Deductibles:    $0 in motion  $0 not in motion

**Additional Coverages or Agreements**

1.    The Certificate Holder is granted a Loss Payee with Lienholder's Interest (Breach of Warranty) as respects Aircraft Physical Damage.  Not to exceed the amount of the lien and subject to a maximum  of the insured value of the aircraft.

This certificate is issued for information purposes only.  It certifies that the policies listed in this document have been issued to the Named Insured.  It does not grant any rights to any party nor can it be used, in any way, to modify coverage provided by such policies.  Alteration of this certificate does not change the terms, exclusions or conditions of such policies.  Coverage is subject to the provisions of the policies, including any exclusions or conditions, regardless of the provisions of any other contract, such as between the Certificate Holder and the Named Insured. Notice is hereby given that AssuredPartners Aerospace is not the Insurer hereunder and shall not be held liable for any loss or damage.  Should any of the above described policies be cancelled before the expiration date thereof, the Issuing Insurer will endeavor to provide thirty (30) days advance notice to the Certificate Holder, but failure to do so shall impose no obligation or liability of any kind upon the Insurer, its agents or representatives.

Date of Issue:    May 19, 2020                              By: _____

                                                              Authorized Representative

AssuredPartners Aerospace is going **GREEN** and changing our communications to **PAPERLESS**!

CERT  AL-AL-COI-O
TS

ASSUREDPARTNERS AEROSPACE
OFFICE 411 AVIATION WAY, FREDERICK, MD 21701
MAIL  P.O. BOX 578, FREDERICK, MD  21705
P 800-622 AOPA (2672)
www.ap-aerospace.com

CONFIDENTIAL

0CERT-AL-AL-COI-O                    2019-04-610089                    01373616

USAO_00001518

**Add. 30**

RN113282274-1584042964

Copy of the Electronic Original® document managed by the eCore® On Demand (EOD™) Service.

**ⅡLAW 553-NY-B-A-eps 10/18**

**RETAIL INSTALMENT CONTRACT**
**SIMPLE FINANCE CHARGE (WITH ARBITRATION PROVISION)**

Dealer Number _____    Contract Number _____

| Buyer Name and Address (Including County and Zip Code) | Co-Buyer Name and Address (Including County and Zip Code) | Seller-Creditor (Name and Address) |
|---|---|---|
| Ariel Legassa | Nilda Viviana Legassa | Tesla Motors New York LLC<br>115 Kisco Ave<br>Mt. Kisco, NY 10549 |

You, the Buyer (and Co-Buyer, if any), may buy the vehicle below for cash or on credit. By signing this contract, you choose to buy the vehicle on credit under the agreements in this contract. You agree to pay the Seller - Creditor (sometimes "we" or "us" in this contract) the Amount Financed and Finance Charge in U.S. funds according to the payment schedule below. We will figure your finance charge on a daily basis. The Truth-In-Lending Disclosures below are part of this contract.

| New/Used/Demo | Year | Make and Model | Vehicle Identification Number | Primary Use For Which Purchased |
|---|---|---|---|---|
| New | 2020 | Tesla Model 3 | 5YJ3E1EB4LF639020 | Personal, family, or household unless otherwise indicated below<br>☐ business  ☐ agricultural  ☐ N/A |

**FEDERAL TRUTH-IN-LENDING DISCLOSURES**

| ANNUAL PERCENTAGE RATE<br>The cost of your credit as a yearly rate. | FINANCE CHARGE<br>The dollar amount the credit will cost you. | Amount Financed<br>The amount of credit provided to you or on your behalf. | Total of Payments<br>The amount you will have paid after you have made all payments as scheduled. | Total Sale Price<br>The total cost of your purchase on credit, including your down payment of $ 3,536.98 is |
|---|---|---|---|---|
| 4.65 % | $ 9,080.00 | $ 60,490.00 | $ 69,570.00 | $ 73,106.98 |

**Agreement to Arbitrate:** By signing below, you agree that, pursuant to the Arbitration Provision on page 5 of this contract, you or we may elect to resolve any dispute by neutral, binding arbitration and not by a court action. See the Arbitration Provision for additional information concerning the agreement to arbitrate.

Buyer Signs X _Ariel Legassa_

Co-Buyer Signs X _Nilda Viviana Legassa_

**Your Payment Schedule Will Be:**    (e) means an estimate

| Number of Payments | Amount of Payments | When Payments Are Due |
|---|---|---|
| 72 | $ 966.25 | Monthly beginning 04/27/2020 |
| N/A | N/A | N/A |

Or As Follows:

N/A

**GAP Waiver Notice**
☒ If this box is checked, and if the vehicle is a total loss because it is confiscated, damaged, or stolen, you will not be liable for the gap amount. The gap amount is the excess, if any, of (1) the amount you would owe under this contract as of the date of loss if the vehicle were not a total loss and you were to prepay the contract in full (less any refunds we get for cancelling optional insurance, maintenance, service or other contracts), over (2) the sum of (a) any past due payments and other amounts due because you broke promises in this contract and (b) the actual cash value of the vehicle immediately before the loss.

**Late Charge.** If payment is not received in full within ___10___ days after it is due, you will pay a late charge of $ ___1.00___ or ___5___ % of the part of the payment that is late, whichever is ___greater___.
**Prepayment.** If you pay early, you will not have to pay a penalty.
**Security Interest.** You are giving a security interest in the vehicle being purchased.
**Additional Information:** See this contract for more information including information about nonpayment, default, any required repayment in full before the scheduled date and security interest.

**EXHIBIT**
**056**
**22-CR-10038-IT**

**WARRANTIES**
The following paragraph does not affect any warranties covering the vehicle that the manufacturer may provide or limit any rights you may have under the Lemon Laws or, for used vehicles, under the certificate of servicibility that was included in your purchase contract. The following paragraph also does not apply if the vehicle is a used vehicle you bought in New York City.

**Unless the Seller makes a written warranty or enters into a service contract within 90 days of the date of this contract, the Seller makes no warranties on the vehicle. Making no warranties means that you get no express warranties, and no implied warranties of merchantability or fitness for a particular purpose.**

The following notice only applies to used vehicles bought in New York City:

**IMPORTANT NOTICE TO BUYER**
(A) STATE LAW REQUIRES THAT SELLERS OF SECOND-HAND CARS CERTIFY IN WRITING TO THE BUYER THAT EACH CAR IS IN SAFE CONDITION AT THE TIME OF SALE.
(B) THIS CERTIFICATION IS A GUARANTEE THAT THE CAR IS IN SAFE CONDITION AT THE TIME OF SALE.
(C) YOU HAVE A RIGHT TO REQUEST THE DEALER TO REPAIR OR TO PAY IN FULL FOR REPAIRS OF ANY UNSAFE CONDITION IN THE CAR WHICH DOES NOT COMPLY WITH THIS CERTIFICATION.
(D) THIS BUSINESS IS LICENSED BY THE DEPARTMENT OF CONSUMER AFFAIRS, 42 BROADWAY, NEW YORK, NEW YORK 10004. COMPLAINT PHONE: (212) 639-9675.

Buyer Signs X _Ariel Legassa_    Co-Buyer Signs X _Nilda Viviana Legassa_    ☒ LAW 553-NY-B-A-eps 10/18 v1    Page 1 of 6

The original document is owned by Wells Fargo Auto and this copy was created on Mar 13, 2020 01:15:44 PM.

USAO_00001629

Copy of the Electronic Original® document managed by the eCore® On Demand (EOD™) Service.

RN113282274-1584042964

---

*The Annual Percentage Rate may be negotiable with the Seller. The Seller may assign this contract and retain its right to receive a part of the Finance Charge.*

---

**HOW THIS CONTRACT CAN BE CHANGED.** This contract contains the entire agreement between you and us relating to this contract. Any change to this contract must be in writing and we must sign it. No oral changes are binding.     Buyer Signs **X** *Ariel Legassa*     Co-Buyer Signs **X** *Nilda Viviana Legassa*

If any part of this contract is not valid, all other parts stay valid. We may delay or refrain from enforcing any of our rights under this contract without losing them. For example, we may extend the time for making some payments without extending the time for making others.

**See the rest of this contract for other important agreements.**

**NOTICE TO BUYER: 1. Do not sign this agreement before you read it or if it contains any blank space. 2. You are entitled to a completely filled in copy of the agreement. 3. Under the law, you have a right to pay off in advance the full amount due. If you do so, you may, depending on the nature of the credit service charge, either (a) prepay without penalty, or (b) under certain circumstances obtain a rebate of the credit service charge. 4. According to law, you have the privilege of purchasing the insurance on the motor vehicle provided for in this contract from an agent or broker of your own selection.**

**You agree to the terms of this contract. You confirm that before you signed this contract, we gave it to you, and you were free to take it and review it. You acknowledge that you have read all pages of this contract, including the arbitration provision on page 5, before signing below. You confirm that you received a completely filled-in copy when you signed it.**

**RETAIL INSTALMENT CONTRACT**

Buyer Signs **X** *Ariel Legassa*     Date 03/13/2020     Co-Buyer Signs **X** *Nilda Viviana Legassa*     Date 03/13/2020

Co-Buyers and Other Owners — A co-buyer is a person who is responsible for paying the entire debt. An other owner is a person whose name is on the title to the vehicle but does not have to pay the debt. The other owner agrees to the security interest in the vehicle given to us in this contract.

Other owner signs here **X**     N/A     Address     N/A

Seller signs  Tesla Motors New York LLC     Date 03/13/2020     By **X** *Yaron Klein*     Title CFO/Treasurer

Seller assigns its interest in this contract to     Wells Fargo Auto     (Assignee) under the terms of Seller's agreement(s) with Assignee.

☐ Assigned with recourse     ☒ Assigned without recourse     ☐ Assigned with limited recourse

Seller  Tesla Motors New York LLC     By *Yaron Klein*     Title  CFO/Treasurer



Original

---

The original document is owned by Wells Fargo Auto and this copy was created on Mar 13, 2020 01:15:44 PM.

USAO_00001634

Add. 32

Rule 701. Opinion Testimony by Lay Witnesses

If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:

**(a)** rationally based on the witness's perception;

**(b)** helpful to clearly understanding the witness's testimony or to determining a fact in issue; and

**(c)** not based on scientific, technical, or other specialized knowledge within the scope of Rule 702 .

Rule 704. Opinion on an Ultimate Issue

**(a) In General — Not Automatically Objectionable.** An opinion is not objectionable just because it embraces an ultimate issue.

**(b) Exception.** In a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense. Those matters are for the trier of fact alone.

**Add. 34**

Rule 403. Excluding Relevant Evidence for Prejudice, Confusion, Waste of Time, or Other Reasons

The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

Rule 1006. Summaries to Prove Content

The proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court. The proponent must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place. And the court may order the proponent to produce them in court.