No. 24-1209

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT
_____

UNITED STATES OF AMERICA,
APPELLEE

v.

ARIEL LEGASSA,
DEFENDANT-APPELLANT
_____

ON APPEAL FROM A JUDGMENT IN A CRIMINAL CASE,
ENTERED IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____

BRIEF FOR THE UNITED STATES
_____

LEAH B. FOLEY
UNITED STATES ATTORNEY

ALEXIA R. DE VINCENTIS
ASSISTANT U.S. ATTORNEY
JOHN JOSEPH MOAKLEY U.S. COURTHOUSE
1 COURTHOUSE WAY
SUITE 9200
BOSTON, MASSACHUSETTS 02210
(617) 748-3211

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................ iii

STATEMENT OF JURISDICTION ........................................................... 1

STATEMENT OF ISSUES ......................................................................... 1

STATEMENT OF THE CASE..................................................................... 1

    A.    Procedural Summary ................................................................. 1

    B.    The Trial Evidence .................................................................. 2

    C.    The Defense Case .................................................................... 5

SUMMARY OF ARGUMENT ................................................................... 7

ARGUMENT .............................................................................................. 8

I.    THE DISTRICT COURT DID NOT COMMIT REVERSIBLE ERROR IN ADMITTING LAY OPINION TESTIMONY ............................... 8

    A.    Procedural Background ............................................................ 8

    B.    Standard of Review ................................................................ 11

    C.    Any Error In Admitting Guilbault's Testimony Was Harmless ............ 12

II.    THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN ADMITTING EVIDENCE OF LEGASSA'S CREDIT CARD EXPENDITURES AND POST-TERMINATION DRAINING OF HIS JOINT ACCOUNT ................................................................... 15

    A.    Procedural Background .......................................................... 16

    B.    Standard of Review ................................................................ 20

    C.    The District Court Did Not Abuse Its Discretion In Admitting Evidence Of The Largest Categories Of Legassa's Credit Card Expenditures .................................................. 20

i

D.    The District Court Did Not Abuse Its Discretion In Admitting Evidence That Legassa Drained His Joint Account ................................24

CONCLUSION......................................................................................................25

CERTIFICATE OF COMPLIANCE..........................................................................26

CERTIFICATE OF SERVICE .................................................................................27

# TABLE OF AUTHORITIES

## CASES

*Old Chief v. United States*,
   519 U.S. 172 (1997)..........................................................22

*United States v. Appolon*,
   695 F.3d 44 (1st. Cir. 2012)...........................................21

*United States v. Belanger*,
   890 F.3d 13 (1st Cir. 2018)............................................11

*United States v. Breton*,
   740 F.3d 1 (1st Cir. 2014)..............................................25

*United States v. Cole*,
   631 F.3d 146 (4th Cir. 2011) ........................................21

*United States v. Doe*,
   860 F.2d 488 (1st Cir. 1988).........................................23

*United States v. Duarte*,
   246 F.3d 56 (1st Cir. 2001)...........................................12

*United States v. Jackson-Randolph*,
   282 F.3d 369 (6th Cir. 2002) ........................................21

*United States v. Kilmartin*,
   944 F.3d 315 (1st Cir. 2019)....................................14, 23

*United States v. Mangual-Santiago*,
   562 F.3d 411 (1st Cir. 2009).........................................23

*United States v. Rathbun*,
   98 F.4th 40 (1st Cir. 2024).......................................20, 22

*United States v. Reyes*,
   24 F.4th 1 (1st Cir. 2022)......................................... 13-14

*United States v. Rivera-Carrasquillo*,
   933 F.3d 33 (1st Cir. 2019)...........................................12

iii

*United States v. Rivera-Ortiz,*
  14 F.4th 91 (1st Cir. 2021)......................................................................20

*United States v. Soto-Beníquez,*
  356 F.3d 1 (1st Cir. 2003).......................................................................15

*United States v. Torres-Galindo,*
  206 F.3d 136 (1st Cir. 2000)...................................................................15

*United States v. Vázquez Rijos,*
  119 F.4th 94 (1st Cir. 2024)....................................................................12

*United States v. Zannino,*
  895 F.2d 1 (1st Cir. 1990).........................................................................8

## STATUTES AND RULES

18 U.S.C. § 1291 ........................................................................................1

18 U.S.C. § 1341 ........................................................................................1

18 U.S.C. § 1957 ........................................................................................1

18 U.S.C. § 3231 ........................................................................................1

Fed. R. Evid. 401 .....................................................................................20

Fed. R. Evid. 403 ...............................................................................20, 24

Fed. R. Evid. 701 .................................................................................8, 11

Fed. R. Evid. 701(a) ................................................................................14

Fed. R. Evid. 701(b) ................................................................................13

## STATEMENT OF JURISDICTION

The district court had subject matter jurisdiction because the indictment charged the defendant, Ariel Legassa, with offenses against the United States.  18 U.S.C. § 3231.  Judgment was entered on February 29, 2024 [Add.1, 37],[1] and Legassa timely appealed [D.168].  This Court has jurisdiction pursuant to 18 U.S.C. § 1291.

## STATEMENT OF ISSUES

1.     The district court did not commit reversible error in admitting lay opinion testimony.

2.     The district court did not abuse its discretion in admitting evidence of Legassa's credit card expenditures and post-termination draining of his joint account.

## STATEMENT OF THE CASE

### A.     Procedural Summary

 On February 17, 2022, a grand jury sitting in the District of Massachusetts returned a 10-count indictment charging Legassa with mail fraud, in violation of 18 U.S.C. § 1341 (Counts One through Seven), and money laundering, in violation of

---

[1] Citations are as follows: "[D.__]" refers to a docket entry; "[Br.__]" and "[Add.__]" refer, respectively, to Legassa's brief and addendum; "[JA.__]" refers to the joint appendix; and "[GSA.__]" refers to the government's supplemental appendix.

1

18 U.S.C. § 1957 (Counts Eight through Ten).  [JA.21-26].  A jury found him guilty of all counts on November 3, 2023, following a 5-day trial.  [D.149].

**B.     The Trial Evidence**

At trial, the government introduced witness testimony and documentary evidence from which the jury could have found that, over the course of eleven months in 2021, Ariel Legassa took advantage of his trusted position at New England Sports Network ("NESN") to defraud the company of over half a million dollars.

Legassa worked at NESN from approximately September 2019 through January 2022.  [JA.351, 408].  During that time, he was the Vice President of Digital and managed a team of roughly 20 people.  [JA.351-52].  He was entrusted in that executive-level role with several responsibilities, including selecting vendors [JA.359], drafting a budget [JA.361], and approving invoices for the digital department below $50,000 [JA.365, 576-77].  [*See also* JA.315-16, 403-04, 506, 582, 337-38, 700-01].

In December of 2020, Legassa began negotiating with a new vendor, Alley Interactive LLC, to assist with improving NESN's website.  [JA.371, 375, 539].  In February of 2021, Legassa told NESN's finance group that Alley Interactive would replace an existing vendor and that NESN should budget roughly $900,000 for Alley Interactive's services.  [JA.372, 383, 1089-90].  On March 3, 2021, NESN finalized

a contract with Alley Interactive [JA.983-94], which is based in New York, New York ("Alley NY"). [JA.983]

As he was finalizing NESN's contract with Alley NY, Legassa was also taking steps to set up his own company—also called Alley Interactive—in Connecticut ("Alley CT"). He created the email address alleyinteractivellc@gmail.com on February 8, 2021 [JA.509, 1027]; opened a post office box for his company in Stamford on February 9 [JA.512, 1021-26]; incorporated "Alley Interactive" with the Connecticut Secretary of State's office on February 11 [JA.520, 1082-88]; and opened a business checking account for the company at Santander on February 19 [JA.526-27, 1007-20].

At the same time, Legassa sent Alley NY repeated email requests for an invoice. On February 1, 2021, he falsely told Alley NY that he needed "an invoice to start the admin process internally," but Alley NY responded that there was no need for an invoice because efforts to date were considered "business development." [JA.568, 1133]. On February 10, he tried again, writing, "Can you please send me the first invoice per the SOW description, and [sic] like to have everything ready," but Alley NY was unable to provide an invoice until a signed contract was in place. [JA.1135].

When Legassa finally received an invoice on March 4 [GSA.35-36], he created a doctored invoice made to look like it came from Alley NY when, in fact,

it would be used to direct payment to the company Legassa had created.  The invoices were nearly identical; they contain the same layout, font, design, and Alley NY's signature logo.  [*Compare* GSA.36, *with* JA.1029-30].

On March 9, 2021, Legassa emailed $110,000 in fake invoices to Leatha Fisher, the accounts payable and payroll manager at NESN.  [JA.566, 1028-30].  The invoices (one for $85,000 and one for $25,000) omitted Alley NY's address.  [JA.1029-30].  In his email, Legassa directed Fisher to remit payment to the Alley CT address.  [JA.1028].

One month later, Legassa sent another email to Fisher and this time requested that she set up two internal accounts for Alley: one Alley NY (the real Alley), and one for Alley CT (Legassa's fake company).  [JA.1034-35].  Legassa wrote: "They have two entities working together, but separately incorporated.  They plan to merge the two entities at the end of the year, and they asked me to please create a separate account and sen[d] payment separately until then."  [JA.1035].  None of this was true.  [JA.557-58].  Fisher followed his instructions, and, going forward, Legassa instructed her whether an invoice was related to Alley NY or Alley CT and included the Alley CT address on the fake invoices.  [JA.582-87, 589-92, 1038-41, 1046-51, 1060-61, 1064-65, 1074-75, 1078-81].

Between March of 2021 and early January of 2022, Legassa submitted fake Alley CT invoices totaling $672,500 interspersed with real Alley NY invoices

4

totaling $492,000.  [JA.1139-40].  During this period, he avoided providing Alley contact information and backup documentation to the NESN accountant tasked with tracking expenses for the digital department [JA.623-30, 642, 644-45, 658-60, 1106-07]; explained increasing Alley expenditures as additional work or reassignments from other vendors [JA.632-42, 646-49, 1089-99]; and pushed to augment the Alley budget to $1.5 million [JA.650-54, 1100-05].  After May of 2021 he also limited his fake invoices to $48,500 [JA.1140], just within the limit of what he could unliterally approve.

In early January of 2022, NESN terminated Legassa after discovering that payments were being made to a company he controlled.  [JA.406-08, 556-57, 661-62].  NESN stopped payment on two outstanding fake invoices Legassa had submitted, but by this time, it had already paid Alley CT $575,000.  [JA.404-06, 1140].  Legassa used this money to pay off car loans, personal loans, an aircraft loan, large credit card bills, and his home-equity line of credit.  [*E.g.*, JA.1142-43, 1146-48].  He also he transferred more than $100,000 in fraud proceeds from a joint account he held with his wife to an account held exclusively by her in the immediate aftermath of being fired.  [JA.764-65; GSA.32]

### C.    The Defense Case

Legassa's defense was that NESN's chief executive officer ("CEO") and its chief operating and financial officer ("COO/CFO") knew and approved of the

money being paid to him in this way. [*See* JA.827-36]. Legassa argued the evidence showed that NESN was in a "digital crisis" in the Spring of 2021 and could not afford to lose him [JA.827-31; *see also* JA.426-75, 1151-55]—though the evidence also showed that NESN's CEO had unfettered authority to raise Legassa's compensation, in fact did raise Legassa's compensation by more than 20% (to $325,000) in September 2021, and could have, but chose not to, pay him even more. [JA.412-23, 497, 1112-23]. Legassa also argued NESN was "not the kind of place where someone could pull off the theft of over a half-million dollars without anyone noticing" [JA.339-40]—though the evidence showed that the CEO and COO/CFO trusted that Legassa was properly reviewing invoices supporting the checks over $50,000 that were sent in stacks for their signature [JA.367-68, 388, 403-04, 501-06, 712-15], and a majority of the Alley CT checks were under the $50,000 amount that would require such a signature anyway [JA.1140].

The jury rejected Legassa's improbable defense and convicted him of all counts.

## SUMMARY OF ARGUMENT

Legassa argues that three categories of alleged evidentiary errors entitle him to a new trial.  None does.

Legassa first identifies statements he claims amounted to improper lay opinion testimony that he committed fraud.  His preserved objections to these statements fail where the statements were either stricken or properly admitted, and his unpreserved objections fail under the resulting plain error standard of review.  Even without regard to preservation, however, none would warrant a new trial.  The undisputed evidence showed that Legassa incorporated an entity with the same Alley Interactive name, directed payment to that entity using fake invoices, and took steps to keep conceal that fact.  There was only one rational explanation for his actions, and it was not that company leadership with the authority to raise his pay was instead secretly funneling him money by paying fraudulent invoices.  There is no doubt the jury would have convicted Legassa even if none of these statements had been made.

Legassa next challenges the admission of evidence concerning his credit card expenditures and post-termination transfer of funds to an account owned solely by wife.  But the district court did not abuse its discretion in concluding that the former category of evidence was probative of Legassa's motive to commit fraud and the latter was probative of his consciousness of guilt.  Nor has Legassa

7

demonstrated that the district court's careful balancing of probative value and unfair effect presents the extraordinary circumstance in which this Court should reverse its on-the-spot judgment. And regardless, the overwhelming evidence of Legassa's guilt would here again render any error harmless.

## **ARGUMENT**

## I.     THE DISTRICT COURT DID NOT COMMIT REVERSIBLE ERROR IN ADMITTING LAY OPINION TESTIMONY.

Legassa first contends that the district court abused its discretion when it permitted NESN's COO and CFO, Raymond Guilbault, "to testify repeatedly, over defense objection, to the legal conclusion that Mr. Legassa had defrauded NESN." [Br.21-22]. That description of Guilbault's testimony, and Legassa's claim that the testimony entitles him to a new trial, are belied by the record.

### A.     Procedural Background

Legassa identifies three statements in Guilbault's testimony that he claims amounted to improper lay opinion on Fed. R. Evid. 701.[2]

The government introduced through Guilbault a summary chart of the invoices Legassa submitted to NESN directing payment to Alley CT. [JA.391-92

---

[2] Legassa identifies in a footnote two additional statements, one by Fisher and one by NESN CEO Sean McGrail, which he notes were admitted over defense objections. [Br.26 n.2]. Because Legassa does not develop—and thus has waived—any argument regarding these statements, *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990), the government does not address them further.

(JA.1140)].  After establishing that NESN paid a total of $575,500 pursuant to those invoices, the government drew Guilbault's attention to the last two invoices and questioned "[w]hat happened to the invoices that have the three starts next two them."  [JA.392].  When Guilbault responded that "[t]hose invoices were not paid," the government asked, "Why not?"  [JA.392].  Guilbault said, "Because I had put a stop payment on those invoices once I became aware of the situation regarding the fraud that was perpetrated against the company" (Statement #1).  [JA.392-93].  The government asked, "By whom?" and Guilbault replied, "Mr. Legassa."  [JA.393].

Legassa did not object until more than ten trial transcript pages later, when the government returned to the final two invoices after eliciting testimony that Guilbault believed the checks he was signing were going to Alley NY [JA.393-404]. The government asked Guilbault to "remind everyone, what happened with those last two payments"; defense counsel objected; and the district court asked the government to reframe the question.  [JA.404].  The government then asked "[w]hat happened to … the last two invoices," and Guilbault responded, "I instructed accounting to stop payment on those invoices."  When the government followed up by asking Guilbault "why" he gave that instruction, defense counsel again objected and asked to be heard.  [JA.404-05].  At sidebar, defense counsel objected on two grounds: first, that the question had been asked and answered (concededly without objection), and second, that the witness was being asked to testify to "a legal opinion

9

… that's for the jury to find." [JA.404-05]. The court directed the government to "ask [the] question in a more limited way, because we don't need him to testify to the final conclusion." [JA.405].

The examination continued:

> Q:     Mr. Guilbault, just focusing on what you did at the time and not—and not characterize it, but just focusing on what you did, you mentioned that you canceled payment on these last two checks. What was it about these two invoices that led you to cancel payment?
>
> A:     It had come to my attention that those payments were being made to a fraudulent company. (Statement #2).

[JA.405-06]. Defense counsel again objected, and the court instructed the witness to "keep the adjectives out and just stick to what specifically happened, or didn't happen." [JA.406]. Guilbault then continued:

> A:     So I instructed accounting not to make those payments when I became aware that there might be a problem with those invoices.
>
> Q:     What was the—without—and just focusing on the facts, what was the problem?
>
> A:     Those payments would have been made to a company controlled by Mr. Legassa.
>
> Q:     And what was the problem with doing that?
>
> A:     That was not a legitimate vendor.

[JA.406].

10

The remainder of the government's examination of Guilbault focused on Legassa's compensation history and NESN's practice of paying all employees using "normal payroll practices." [*See* JA.406-25]. At the end of the examination, the government asked Guilbault why, as he had testified, he would not have agreed to pay Legassa additional compensation through Alley CT. [JA.424]. The court allowed the question over objection. [JA.425]. Guilbault responded, "Because it would be unethical and illegal" (Statement #3), at which point defense counsel objected again. [JA.425]. The court struck the testimony, and Guilbault's direct examination concluded with his confirmation that he never agreed to pay any NESN employee through a side deal. [JA.425].

## B.    Standard of Review

Pursuant to Rule 701, lay opinion testimony is admissible if it is "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or otherwise specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. This Court reviews preserved challenges to a district court's decision to admit lay opinion testimony for abuse of discretion and unpreserved challenges are reviewed for plain error. *United States v. Belanger*, 890 F.3d 13, 24 (1st Cir. 2018). To succeed under the latter standard, a defendant must demonstrate "(1) that an error occurred (2) which was clear or obvious and which not only (3) affected the

11

defendant's substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings." *United States v. Duarte*, 246 F.3d 56, 60 (1st Cir. 2001).

### C.    Any Error In Admitting Guilbault's Testimony Was Harmless

Legassa's description of Guilbault's testimony as "repeatedly" opining "over defense objection" that "Legassa had defrauded NESN" is inapt.  The first statement Legassa identifies was concededly unobjected-to; the second was objected to (as relevant here) only on ultimate-issue grounds and did not, in fact, go to the ultimate issue; and the third was stricken.  None warrants a new trial.

As an initial matter, Guilbault's testimony that it would have been "unethical and illegal" to pay Legassa through a side deal was stricken from the record [JA.425], and the court instructed the jury both in its preliminary and final instructions that stricken testimony "is not evidence and must not be considered" [JA.320; *accord* JA.845].  Legassa has not made, and has therefore waived, any argument to rebut the presumption that those instructions were followed.  *See United States v. Vázquez Rijos*, 119 F.4th 94, 110-11 (1st Cir. 2024).  Striking Statement #3 from the record thus "sufficed to alleviate any risk of prejudice."[3]  *Id.* (quoting *United States v. Rivera-Carrasquillo*, 933 F.3d 33, 45 (1st Cir. 2019)).

---

[3]  The same is true of McGrail's stricken statement that Legassa worked for NESN "till January of '22, when we discovered he had stolen—" [JA.698], which Legassa cites as having "amplified" Guilbault's testimony [Br.30].

Legassa's attack on the *un*stricken testimony fares no better.  Only his objection to Guilbault's testimony that "[i]t had come to [his] attention that [the last two] payments were being made to a fraudulent company" is preserved, and even then, the only relevant objection Legassa made below was that the testimony called for an opinion on the ultimate issue.  [JA.404-06 (objecting that Guilbault was being asked to testify to a "legal opinion … that's for the jury to find" and raising no additional grounds for objection when the court instructed the government to "ask [the] question in a more limited way, because we don't need him to testify to the final conclusion" and told Guilbault to "keep the adjectives out and just stick to what specifically happened, or didn't happen.")].  Contrary to Legassa's contention [Br.27], however, Guilbault did not opine on the ultimate issue of Legassa's fraudulent intent; as the testimony immediately following Statement #2 shows, Guilbault used "fraudulent company" to refer to the fact that Alley CT "was not a legitimate vendor" to NESN—a fact helpful to the jury under Rule 701(b).  *See United States v. Reyes*, 24 F.4th 1, 25 (1st Cir. 2022) (rejecting the proposition that a witness's lay opinion "invaded the jury's province and was, thus, inadmissible because it concerned *facts relevant* to innocence or guilt" (cleaned up)).  It was also a fact that was well supported by Guilbault's repeated—and unobjected-to—testimony that NESN "entered into the master services agreement … and the two statement[s] of work[]" with Alley NY, not Alley CT [JA.403; *see also* JA.369,

13

373, 381, 394-96].  Legassa's newly raised argument that Statement #2 was not

"based on [Guilbault's] own perception" consistent with Rule 701(a) [Br.26]

meanwhile fails on plain error review, since it is far from "clear" or "obvious" from

Guilbault's statement that he "became aware" of the problem or that "[i]t had come

to [his] attention" signaled an opinion based on hearsay as opposed to firsthand

knowledge he gained as NESN's COO/CFO.

Furthermore, even if the district court abused its discretion in failing to *sua

sponte* strike Statement #2, any such error was harmless.  The evidence that Legassa

defrauded NESN was overwhelming, and his attempt to explain away his

incorporation of an entity with the same Alley Interactive name, creation of

doctored invoices, and false explanations as part of a CEO- and COO/CFO-

approved side deal was fanciful.  *See United States v. Kilmartin*, 944 F.3d 315, 338

(1st Cir. 2019) ("[T]he strength or weakness of the government's evidence of guilt

is normally the most important integer in the harmlessness equation.").  What is

more, and as Legassa's own briefing suggests [Br.28-29], Guilbault was subject to

substantial cross-examination.  [*See* JA.425-75; *see also* JA.828-33 (closing

argument)].  Given the weight of the evidence of Legassa's guilt and the full

exploration of Guilbault's credibility at trial, it is "highly probable that any potential

error … did not influence the jury's resolution of the case." *Reyes*, 24 F.4th at 25-

26 (quotations omitted) (citing such factors to conclude that testimony would be

harmless even if it amounted to erroneously-admitted lay opinion); *see also, e.g.*, *United States v. Torres-Galindo*, 206 F.3d 136, 140-42 (1st Cir. 2000) (deeming the erroneous admission of testimony harmless where the witness's credibility was "fully explored" at trial and the weight of the evidence against the defendant was "so great" that the "testimony did not likely affect the jury's verdict").

The same harmlessness analysis dooms Legassa's unpreserved challenge to Guilbault's testimony that he stopped payment on the final two invoices upon learning of "the fraud that was perpetrated against the company" by Legassa.  It is highly unlikely that omission of Statement #1, like omission of Statement #2, would have led the jury to view the overwhelming evidence of Legassa's guilt any differently.  And if an error is harmless, "a fortiori, no plain error occurred." *United States v. Soto-Beníquez*, 356 F.3d 1, 49 (1st Cir. 2003).

## II. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN ADMITTING EVIDENCE OF LEGASSA'S CREDIT CARD EXPENDITURES AND POST-TERMINATION DRAINING OF HIS JOINT ACCOUNT.

Legassa next challenges the district court's decision to admit evidence of credit card expenses he covered using NESN funds paid to Alley CT and his transfer of funds to accounts held solely in his wife's name in the three days immediately following NESN's discovery of his fraud.  [Br.31-36].  The district court did not abuse its discretion in admitting either category of evidence, nor would Legassa be entitled to a new trial even if it had.

15

## A.    Procedural Background

Legassa filed a pre-trial motion in limine in which he noted that financial records produced by the government in discovery "provide a comprehensive look at how the family spends money and what it spends money on" and argued that "[w]hile some of the information in the account records is likely admissible and relevant," other information was "largely irrelevant" and "constitute[d] an invasion of … privacy." [D.111 at 1-2]. Legassa informed the court that the government had represented that it intended to offer relevant information in summary form, which, he said, "would largely alleviate [his] privacy/relevancy concerns." [D.111 at 2].

The government confirmed in its responsive filing [D.119 at 2-3] and at the final pretrial conference [Add.16-17] that it intended to proceed by way of summary chart. It also noted willingness to consider possible redactions to the forthcoming summary charts in the event of concerns about a particular expense or set of records. [D.119 at 3; Add.16-17]. Defense counsel proceeded to argue that it was relevant only that Legassa spent money on personal expenses, not what those personal expenses were, and that "say[ing] they spent X thousands of dollars on dinner at restaurants or X thousands of dollars on home improvements" was prejudicial because it created "the image that … here's a family living high on the hog because they just had this windfall." [Add.19-20]. The government rejoined that it was entitled to show that Legassa was living beyond his means—his motive for

16

committing the fraud [Add.20-22]. The district court ruled that Legassa had not "articulated grounds to keep this information out," explaining that "simply because ... it looks like a big expense on this item, that's not a reason for me not to let them do it." [Add.22, 24]. It added that if Legassa had "specific items of privacy concerns, we can figure out how to deal with those." [Add.22].

At trial, the government introduced through an FBI forensic accountant a series of summary charts demonstrating that Legassa spent the Alley CT funds on personal expenses. [JA.724]. Exhibit 162 identified the $575,000 in NESN checks deposited into the Alley CT Santander account. [JA.1142]. Exhibit 163 showed the total withdrawals from that account between April 2021 and January 2022, which included $248,105 in credit card payments, $156,500 in wires to the joint checking account Legassa shared with his wife, a $49,777 Tesla payoff, a $26,622 airplane payoff, a $20,500 Land Rover payment, a $20,000 wire to Citibank, $15,799 in tax payments, $15,649 in cash withdraws, an $11,600 payment to Kendall Realty Trust, a $7,000 payment to Chippanee Construction LLC, and $8,069 in other payments. [JA.1143]. Exhibit 164 showed the amounts of Legassa's monthly credit card purchases and balances during roughly the same period. [JA.1144]. The purchases increased significantly after the NESN payments began, while the balances remained relatively consistent. [JA.1144]. Defense counsel indicated he had "no objection" when the government moved to introduce these exhibits. [JA.728-35].

17

The government sought to introduce another summary chart, Exhibit 165, which would have shown the types of credit card purchases Legassa was making. [JA.737].  Referencing his pretrial motion, Legassa objected that showing "what the credit card purchases were actually for" was irrelevant and also prejudicial because it showed "amounts that … could seem excessive for certain things to people." [JA.737-38].  Noting that defense counsel had acknowledged the relevance of money being spent on personal expenses, the government rejoined: "We can't just say yes, it was used for personal spending.  We have to show that."  [JA.738].  The district court permitted questioning on the chart but said it would require redaction of reference to bars and alcohol in a category labeled "Restaurants/Bars/Alcohol," which it considered "unduly prejudicial."   [JA.739].   The government then proceeded to elicit testimony that the total amount of credit card spend was about $326,000; that the largest category of expenditures was on contractors and home improvement, which was consistent with records showing Legassa installed a pool at his home; and that approximately $55,000, $25,000, $12,000, and $12,000 were spent on Amazon, retail, European travel, and aircraft or flying, respectively. [JA.740-42].  The court later ruled that the jury would not be given even a redacted version of the chart, as it had already heard testimony "on the big items."  [JA.764].

Additional summary charts were admitted without objection.  [JA.743-52]. Exhibit 166 showed the funds transferred into the Legassa joint checking account,

while Exhibits 167-169 showed what the funds were then used for. [JA.1145-48]. Exhibit 170 showed the Alley CT Santander account activity for April of 2021— when the first of the NESN checks was deposited—and was accompanied by testimony introducing records showing that the paid-off Tesla and airplane loans were in Legassa's name. [JA.752-56, 1149]. Legassa objected when, during this testimony, the government sought to elicit information (not contained in any chart) about Amazon purchases related to automobiles. [JA.757]. The government stated that it would move on and directed the witness's attention back to the Citibank wire listed in Exhibit 163. [JA.757]. The district court initiated a sidebar conference, where it said it had "overruled the defendant's objection on the volume of material you're getting in, but you're really pushing the envelope here," and confirmed that the government was not "planning to go through every Amazon purchase." [JA.757-58].

The government immediately moved on to the final summary chart, Exhibit 171. [JA.758]. This chart, admitted over Legassa's objection, showed that Legassa's non-mortgage loan balances dramatically decreased over the life of his scheme. [JA.758, 1150].

The government lastly inquired of the witness regarding transfers from a joint account Legassa held with his wife to an account solely in her name during the three days following his January 6, 2022 firing. [JA.760]. The district court admitted the

testimony over Legassa's objection that transferring the money was consistent with a belief that he was entitled to it, agreeing with the government that it could argue the transfers were evidence of consciousness of guilt. [JA.761-63]. The witness then identified a $22,000 transfer to a home equity line of credit in Legassa's wife's name on January 7 and a $80,000 transfer to her savings account on January 10, which left the joint account balance at $5. [JA.748, 764-65; GSA.32].

### B.      Standard of Review

Legassa's preserved relevance- and prejudice-based objections to the credit card and transfer evidence are reviewed for abuse of discretion. *United States v. Rivera-Ortiz*, 14 F.4th 91, 101 (1st Cir. 2021). Relevancy under Rule 401 "is a very low threshold that only requires the tendered evidence to move the inquiry forward to some degree." *United States v. Rathbun*, 98 F.4th 40, 51 (1st Cir. 2024) (quotation omitted) (construing Fed. R. Evid. 401). And a district court's "on-the-spot judgment" "weighing … probative value versus unfair effect" under Rule 403 will be reversed "from the vista of a cold appellate record" "only in extraordinarily compelling circumstances." *Id.* (quotation omitted) (construing Fed. R. Evid. 403).

### C.      The District Court Did Not Abuse Its Discretion In Admitting Evidence Of The Largest Categories Of Legassa's Credit Card Expenditures

Legassa's challenge to the admission of testimony concerning his credit card expenditures goes nowhere. The testimony was limited to identifying some of the

largest categories of credit card expenses—expenses which Exhibit 163 identified as the most significant source of spending from the Alley CT account and Exhibit 164 showed to have increased significantly during the life of the scheme.  This evidence was relevant and not unduly prejudicial, and any error in admitting the evidence would, in any event, be harmless.

Evidence that Legassa used money derived from his scheme to spend above his means was relevant because it was probative of his motive—to finance a "lavish lifestyle."  *United States v. Appolon*, 695 F.3d 44, 60 (1st. Cir. 2012) (evidence that proceeds were used to buy "marijuana, clothes, vehicles, and firearms" was probative of motive for mortgage fraud scheme); *accord, e.g.*, *United States v. Cole*, 631 F.3d 146, 155-56 (4th Cir. 2011) (evidence of defendant's "lavish spending" was probative of his motive for violating tax laws); *United States v. Jackson-Randolph*, 282 F.3d 369, 376-80 (6th Cir. 2002) (evidence of defendant's shopping and gambling expenses was probative of motive for committing financial crimes). Legassa's argument that expenditure evidence is relevant only when a defendant as "*no* apparent source of income" [Br.32 (emphasis added)] overreads the case law and makes no sense.  Even a "highly paid employee" [Br.33] can desire more than he can afford.

Identifying the largest categories of Legassa's credit card expenses was part and parcel of demonstrating that motive.  Testimony that the expenditures were

21

concentrated on home improvement, retail, and travel confirmed that they were being used to prop up Legassa's lifestyle, not to finance bona fide work performed by Alley CT. Legassa appears to suggest [Br.33] that the government should have been confined on the latter point to the forensic accountant's testimony that she saw no payroll expenses, payroll taxes, or payments to vendors, engineers, or developers paid from the Alley CT account. [JA.733]. But the government was entitled, absent overriding Rule 403 concerns, to "'tell[ ] a colorful story with descriptive richness' and 'not just to prove a fact but to establish its human significance.'" *Rathbun*, 98 F.4th at 52 (quoting *Old Chief v. United States*, 519 U.S. 172, 187 (1997)).

As for Rule 403, Legassa fails to demonstrate anything even beginning to approach the "extraordinarily compelling circumstances" where this Court should find that the district court abused its discretion in balancing the parties' competing interests. The court left open the possibility of excluding expenditure information that raised privacy concerns [D.111 at 2], excluded evidence relating to bar and alcohol spending that it considered unduly prejudicial [JA.739], and prohibited testimony about specific Amazon purchases that it found cumulative [JA.757-58]. But it reasonably understood that neither the purpose nor the effect of the credit card expenditure evidence it did admit was to "appeal to class prejudice," as Legassa contends [Br.33]. The evidence was used in opening [JA.333-34] and closing [JA.812-13] to make the permissible motive point spelled out above, and Legassa

22

fails to identify anything in the government's presentation that called out for the limiting instruction he never requested yet now faults the court for failing to provide [Br.33]. *See United States v. Mangual-Santiago*, 562 F.3d 411, 429 (1st Cir. 2009) (evidence not unfairly prejudicial where it "was neither shocking nor heinous and was not of a nature which was likely to overwhelm the emotions of an ordinary juror" (cleaned up)). The court was well within its broad discretion in admitting the evidence, and its final instruction that the jury "must decide the case solely on the evidence before [it] and according to the law" without "influence[] by any personal likes or dislikes, prejudices, or sympathies" [JA.841] was sufficient to guard against any potential for unfair prejudice.

Moreover, Legassa would not be entitled to a new trial even if he could establish error because properly admitted evidence supplied overwhelming evidence of his guilt. The cases Legassa cites [Br.34]—involving improper emotional appeals held harmless in light of the strength of the evidence—do nothing to advance his argument to the contrary. *See Kilmartin*, 944 F.3d at 337-38 (finding the erroneous admission of a "barrage of emotionally laden testimony" and emails harmless where the properly admitted evidence was overwhelming and the defense "feeble"); *United States v. Doe*, 860 F.2d 488, 494 (1st Cir. 1988) (finding on plain error review that an improper "call for the jury to get even for all the wrongs imposed on the good people of our society … by punishing the defendants" did not require a new trial

23

because evidence of the defendants' guilt was "simply too overwhelming" and their

defense farfetched).

### D.    The District Court Did Not Abuse Its Discretion In Admitting Evidence That Legassa Drained His Joint Account

Legassa's challenge to the admission of evidence that he drained his joint bank

account with his wife upon his termination from NESN is equally unavailing.

Legassa does not dispute that this evidence satisfied the "very low threshold" for

relevancy, as his movement of funds to accounts held solely in his wife's name upon

NESN's discovery of his fraud was probative of his consciousness of guilt.  Instead,

he argues that probative value was outweighed by a danger of unfair prejudice.

[Br.35].

But his prejudice argument does not track.  Setting aside that the argument

was not raised below, the fact that the transfers were *from* a joint account rather than

the Alley CT Santander account or another account Legassa owned *alone* [Br.35] is

beside the point; what mattered was that he transferred proceeds of his fraud *to* an

account *not* in his name.  It is also irrelevant that Legassa was unaware at the time

of the transfers that NESN had filed a civil suit against him [Br.35 *see also* JA.409-

10]; as the government pointed out below [JA.763], his termination provided all the

notice needed for the jury to draw an inference of consciousness of guilt.[4]

---

[4] To the extent Legassa means to imply that the district court failed to engage in a Rule 403 balancing (as opposed to simply reached a result he asserts is incorrect)

24

Legassa's harmlessness argument also fares no better here than in connection with his other claims.  Had the jury not heard the few lines of testimony about his post-termination transfers (testimony that, contrary to Legassa's contention [Br.36], went unmentioned in the government's opening and closing), it undoubtedly would still have returned a guilty verdict based on the overwhelming evidence of his guilt.

## **CONCLUSION**

For these reasons, the government respectfully requests that the Court affirm the judgment.

Respectfully submitted,

LEAH B. FOLEY
United States Attorney

By:    /s/ *Alexia R. De Vincentis*
Alexia R. De Vincentis
Assistant U.S. Attorney

---

[*see* Br.35], that claim is meritless.  Given that express Rule 403 determinations are not required, *see United States v. Breton*, 740 F.3d 1, 14 (1st Cir. 2014) (collecting cases), the court's discussion of this evidentiary dispute and its explicit balancing of others more than suffices to confirm that it "tacitly performed this same balancing" here, *id.* at 15.

## CERTIFICATE OF COMPLIANCE WITH
## Rule 32(a)

**Certificate of Compliance with Type-Volume Limit,
Typeface Requirements, and Type-Style Requirements**

1.      This brief complies with the type-volume limit of Fed. R. App. P. 32(a)(7)(B) because this brief contains 5,690 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Times New Roman 14 point, in Microsoft Word version 2019.


/s/ *Alexia R. De Vincentis*
Alexia R. De Vincentis
Assistant U.S. Attorney

Dated:  March 21, 2025

## **CERTIFICATE OF SERVICE**

I, Alexia R. De Vincentis, Assistant U.S. Attorney, hereby certify that on March 21, 2025, I electronically served a copy of the foregoing document on the following registered participant of the CM/ECF system:

Leslie Feldman-Rumpler, Esq.
4 Cypress Street, Suite 7
Brookline, MA 02445

/s/ *Alexia R. De Vincentis*
ALEXIA R. DE VINCENTIS
Assistant U.S. Attorney

27