**Not for Publication in West's Federal Reporter**

# United States Court of Appeals
## For the First Circuit

No. 24-1209

UNITED STATES OF AMERICA,

Appellee,

v.

ARIEL LEGASSA,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Indira Talwani, U.S. District Judge]

Before

Montecalvo and Aframe, Circuit Judges,
and Vélez-Rivé,* District Judge.

Leslie Feldman-Rumpler for appellant.

Alexia R. De Vincentis, Assistant U.S. Attorney, with whom Leah B. Foley, U.S. Attorney for the District of Massachusetts, was on brief, for appellee.

July 30, 2025

---

* Of the District of Puerto Rico, sitting by designation.

**AFRAME**, Circuit Judge.  Ariel Legassa, a former vice president at New England Sports Network ("NESN"), was charged with stealing nearly $600,000 from NESN by setting up a fake company and using it to charge NESN for work that was never done.  Based on this conduct, a jury convicted Legassa of seven counts of mail fraud, 18 U.S.C. § 1341, and three counts of money laundering, 18 U.S.C. § 1957.  Legassa appeals his conviction, arguing that erroneously admitted evidence tainted the verdict thus requiring a new trial.  We affirm.

## I.   Background

We describe the relevant facts, taking a "balanced approach" to our description of the record.  See United States v. Velazquez-Fontanez, 6 F.4th 205, 212 (1st Cir. 2021) (citation and internal quotation marks omitted).

NESN hired Legassa in September 2019 as vice president of digital operations, with a starting annual salary of $255,000 plus bonus compensation.  Legassa reported to Raymond Guilbault, NESN's chief operating officer and chief financial officer.  Guilbault, in turn, reported to NESN's former chief executive officer, Sean McGrail.  This case involves Legassa's conduct in 2021 and early 2022.

Legassa's job duties included budgeting, strategic planning, staffing, and hiring vendors to strengthen NESN's digital capacity.  Legassa set the 2021 budget for NESN's digital

operations. That budget allotted a substantial sum to pay outside vendors for various projects such as revamping NESN's website and designing new online products. Ordinarily, when a vendor completed work for NESN's digital operations, it would send an invoice directly to Legassa, who would approve the invoice and submit it for payment through NESN's invoicing system. Any invoice for $50,000 or more required additional approval from Guilbault, while invoices for less than $50,000 required only Legassa's approval. NESN paid approved invoices by paper check, which Guilbault and McGrail personally signed, and which NESN then mailed to the vendors.

In early 2021, Legassa reached an agreement with Alley Interactive, LLC ("Alley NY"), a New York-based vendor, to assist in the development of NESN's website. On March 3, 2021, NESN (through Legassa) and Alley NY signed a master services agreement that governed the work Alley NY would do for NESN. Legassa was Alley NY's only contact at NESN. At Legassa's request, NESN budgeted approximately $1 million to pay Alley NY for services provided in 2021.

Meanwhile, at around the same time, Legassa established a fictitious vendor in Connecticut, which he called Alley Interactive, LLC ("Alley CT"), and which he controlled. On February 8, 2021, he created a new email address, "alleyinteractivellc@gmail.com," for the business. The next day,

he applied for a mailbox in Stamford, Connecticut, and listed "Alley Interactive LLC" on the application. Two days later, he filed a signed certificate of incorporation for Alley CT with the Connecticut Secretary of State, using the newly created mailing and email addresses. And the following week, he opened a business checking account for Alley CT with Santander Bank.

As part of his scheme, Legassa created an Alley CT invoice that looked like an Alley NY invoice. To create the invoice, Legassa emailed Alley NY's chief executive officer to request an Alley NY invoice. This request came more than a month before NESN and Alley NY entered into the master services agreement. Alley NY did not send the invoice, so Legassa followed up a week later. Again, Alley NY did not send an invoice. Finally, on March 4, 2021, a day after NESN and Alley NY signed the master services agreement, Alley NY sent Legassa an invoice. Legassa then altered the invoice by adding the Alley CT address and removing Alley NY's banking information.

Soon after, Legassa began approving and submitting Alley NY invoices for work it performed on NESN's website. At the same time, Legassa also began submitting Alley CT invoices for work that was never performed. To evade any suspicion that might arise from the slightly different vendor names and invoice forms, Legassa told NESN's accounts payable and payroll supervisor that Alley NY and Alley CT were "two entities working together, but separately

incorporated. They plan to merge . . . at the end of the year and they asked me to please create a separate account and send payment [to Alley CT] separately until then."

Legassa submitted a total of eleven Alley CT invoices from March 2021 to January 2022. Guilbault gave the final approval to five of the first six, each of which exceeded $50,000. Legassa alone approved the next three because they each were for $48,500 and thus did not require Guilbault's approval. Finally, Guilbault rejected the last two invoices because, by then, Guilbault knew that Legassa owned Alley CT.

NESN paid the first nine Alley CT invoices through seven checks totaling $575,500. Legassa deposited each check into the Alley CT checking account. He then withdrew money and used it to fund various personal and family expenses, including approximately $250,000 in credit card bills, wires to a joint checking account owned by Legassa and his wife, two car loans, an airplane loan, home improvements, and taxes.

On September 19, 2021, following a threat by Legassa to leave NESN, Guilbault and McGrail increased Legassa's salary to $265,200. Following further negotiating by Legassa, NESN again increased his salary in November 2021 to $325,000. Also in November 2021, Legassa asked NESN's finance department to increase the 2022 Alley NY budget to $1.5 million. The finance department granted that request.

Legassa's scheme crumbled in January 2022, after Alley NY conducted a public records search and discovered both the existence of Alley CT and that Legassa owned the company. Word of this discovery reached NESN, which fired Legassa on January 6, 2022. Thereafter, a grand jury indicted Legassa on seven counts of mail fraud -- one count for each check NESN sent to Alley CT. It also charged him with three counts of money laundering for each withdrawal from the Alley CT checking account that exceeded $10,000. Legassa pleaded not guilty and proceeded to trial.

At trial, the district court allowed the introduction of evidence, sometimes over Legassa's objection, that involved witness characterizations alleged to be improper lay opinion testimony under Federal Rule of Evidence 701. The court also allowed the introduction of evidence, over defense objection, of Legassa's spending and certain bank transfers Legassa made from a personal account after he was fired. Legassa argued, unsuccessfully, that the admission of this latter evidence violated Federal Rules of Evidence 401 and 403, because it was irrelevant or, alternatively, because its unfairly prejudicial effect substantially outweighed its probative value.

As a defense, Legassa alleged that Alley CT was actually a joint effort among him, Guilbault, and McGrail to provide him extra compensation, so he would not leave NESN and thereby set back NESN's progress in digital operations during the COVID

pandemic. Unpersuaded, the jury found Legassa guilty on all ten counts. The district court subsequently sentenced Legassa to forty-two months of imprisonment and ordered that he pay $580,500 in restitution. This timely appeal followed.

## II.   Challenges under Rule 701

Legassa first argues that the district court mistakenly allowed Guilbault to make two statements using the word "fraud" during his testimony. Legassa also argues that a third statement by Guilbault, in which he called a theoretical side deal to pay Legassa "unethical and illegal," and which the court immediately struck, nonetheless tainted the proceedings sufficiently to require a new trial. Legassa argues that all three statements were legal opinions by a lay witness that did not meet the requirements set forth by Federal Rule of Evidence 701, which governs opinion testimony by lay witnesses. The government responds that there was no error and that, if there was error, it was harmless.

We start with Guilbault's two uses of the term "fraud." The government called Guilbault and asked him on direct examination why he did not approve the final two invoices that Legassa submitted to him. Guilbault responded that he "put a stop payment on those two invoices once [he] became aware of the situation regarding the fraud that was perpetrated against [NESN]." Legassa did not object. Later in the examination, the government asked

Guilbault to remind the jury why he did not approve the final invoices. Guilbault responded that "[i]t had come to [his] attention that those payments were being made to a fraudulent company." This time, Legassa objected and stated that he also should have objected to Guilbault's prior use of the word "fraud." Because Legassa's objection to the first statement was untimely, the district court overruled his objection to the first "fraud" statement. In response to Legassa's objection to the phrase "fraudulent company," the court instructed Guilbault to "keep the adjectives out" of his testimony.

> Federal Rule of Evidence 701 provides:
>
> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

The government does not contest that the admission of this evidence is governed by Rule 701, and we assume the same for the sake of argument. We also assume that the issue is fully preserved and that the statements should not have been allowed under Rule 701. Even with those assumptions, the admission of this evidence was clearly harmless.

An error in the admission of testimony is harmless if "it is highly probable that the error did not influence the

verdict."  United States v. Rodríguez-Adorno, 695 F.3d 32, 38 (1st Cir. 2012) (citation omitted).  Factors we consider in determining if erroneously admitted testimony is harmless include "the importance of the testimony to the case, the cumulativeness of the testimony, the presence or absence of other evidence corroborating or contradicting the testimony, the extent of permitted cross-examination, and the overall strength of the government's case."  United States v. Andino-Rodríguez, 79 F.4th 7, 22 (1st Cir. 2023) (citation omitted).  The burden of showing that any error was harmless rests on the government.  United States v. Taylor, 848 F.3d 476, 484 (1st Cir. 2017).

Here, the evidence against Legassa was so overwhelming that there is no likelihood that the Guilbault's "fraud" testimony "influence[d] the verdict."  Rodríguez-Adorno, 695 F.3d at 38 (citation omitted). Legassa indisputably invented a fake vendor with a name and invoice similar to a vendor already working for NESN, and whose only contact at NESN was Legassa.  He also made an email address, obtained a mailing address in Connecticut, incorporated a company in Connecticut, and opened a business checking account for Alley CT in his own name.  It was therefore essentially undisputed that Alley CT was a fake company.  Then, over eleven months, Legassa fabricated eleven invoices for the fake company and banked almost $600,000, which he spent on home improvements, vehicles, loans, and credit card payments, among

other expenses. In view of this evidence, we do not see how Guilbault's use of the terms "fraud" and "fraudulent company," each a single time, influenced the verdict. This is especially so because the government did not present Guilbault as someone with special knowledge of what constitutes fraud. Rather, the government presented Guilbault as an executive of the victim company whom Legassa duped into signing fake invoices and Legassa cross-examined Guilbault to suggest that he was part of the scheme. No matter which view of Guilbault the jury took, it is unlikely that, in these circumstances, the jury would have given Guilbault's view of what constitutes fraud substantial weight.

Nor does Guilbault's use of the phrase "unethical and illegal" provide a basis for a retrial. Guilbault's use of "unethical and illegal" occurred when the government asked Guilbault whether he was complicit in the Alley CT scheme. Guilbault responded that he was not. When the government asked why not, Guilbault responded, "[b]ecause it would be unethical and illegal." Legassa objected, and the district court immediately struck Guilbault's statement. At the conclusion of the trial, the court reiterated an instruction it gave at the beginning of the trial that the jury should disregard any stricken evidence.

Legassa argues that, notwithstanding the district court's ruling and curative instruction, Guilbault's statement must have affected the jury's verdict because it "went to the heart

of the government's case."  We are unpersuaded.  "[O]n review, we must presume that jurors will follow a direct instruction to disregard the offending evidence."  Ramírez v. Debs-Elías, 407 F.3d 444, 448 (1st Cir. 2005) (citing United States v. Sepulveda, 15 F.3d 1161, 1185 (1st Cir. 1993)).  "This presumption is only rebutted if 'it appears probable that . . . responsible jurors will not be able to put the testimony to one side, and, moreover, that the testimony will likely be seriously prejudicial to the aggrieved party.'"  Id. (omission in original) (quoting Sepulveda, 15 F.3d at 1185).

Here, Legassa has provided us with no reason to think that the jurors were unable to set this testimony to the side.  Moreover, we fail to see how this stricken testimony was seriously prejudicial given that it was Guilbault's response to Legassa's accusation that he was part of the wrongdoing.  We thus decline Legassa's request to vacate his convictions on this basis.

### III. Challenges under Rules 401 and 403

Legassa next argues that the district court violated Federal Rules of Evidence 401 and 403 when it admitted (1) evidence of Legassa's spending on luxury items during the scheme, and (2) evidence that, shortly after NESN fired him, Legassa transferred money out of a joint bank account he shared with his wife.  Legassa contends that this evidence was irrelevant under Federal Rule of Evidence 401 or, alternatively, of such marginal

relevance, and so likely to engender unfair prejudice, that its admission violated Federal Rule of Evidence 403.  In support of his unfair prejudice argument, Legassa says that evidence of his spending on luxury items invoked class prejudice and that the evidence of bank transfers likely misled the "jurors to assume that there was something nefarious about the transfer of funds." The government responds that the admission of this evidence was appropriate under Rules 401 and 403.

We review preserved challenges to evidentiary rulings, including challenges to rulings under Rules 401 and 403, for an abuse of discretion.  United States v. Rathbun, 98 F.4th 40, 47 (1st Cir. 2024).  Under Rule 401, evidence is relevant if "it has any tendency to make a fact more or less probable" and "the fact is of consequence" in the case.  A district court may only admit evidence that it deems relevant, Fed. R. Evid. 402, but Rule 401 sets a "very low bar." United States v. Rodríguez-Soler, 773 F.3d 289, 293 (1st Cir. 2014).  Our review of a district court's relevance determinations is "quite deferential," and we will only reverse such determinations in "exceptional cases."  United States v. Armenteros-Chervoni, 133 F.4th 8, 27 (1st Cir. 2025) (citations omitted).

Under Rule 403, a district court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice" or "misleading the jury."

Relevant evidence may be unfairly prejudicial if it has a "tendency to suggest decision on an improper basis," such as "an emotional one." Old Chief v. United States, 519 U.S. 172, 180 (quoting Fed. R. Evid. 403 advisory committee's note).  We have said that "only in the rarest and most compelling cases 'will we, from the vista of a cold appellate record,' reject a judge's on-the-scene Rule 403 ruling." Rodríguez-Soler, 773 F.3d at 294 (quoting DiRico v. City of Quincy, 404 F.3d 464, 468 (1st Cir. 2005)).

Here, the evidence of Legassa's voluminous spending on luxury items was plainly relevant because it was probative of his motive to steal money from NESN.  See United States v. Appolon, 695 F.3d 44, 60 (1st Cir. 2012) (stating that evidence of spending on marijuana, clothes, vehicles, and firearms had "significant probative value" in establishing motive for participating in mortgage fraud scheme).  Similarly, the bank transfer evidence was plainly relevant because it tended to show Legassa's consciousness of guilt, insofar as he wanted immediately to remove the money from a personal account in his name once he learned that NESN was suspicious of his conduct.  See United States v. Mangual-Santiago, 562 F.3d 411, 428-29 (1st Cir. 2009) (stating that evidence of post-conspiracy bank activity in conspiracy to commit money laundering case was relevant and not unfairly prejudicial because it showed defendant's intent to conceal funds).  Moreover, there is nothing about this case suggesting that it involves rare and

compelling circumstances calling for appellate disruption of the district court's weighing of the Rule 403 balance.  In concluding that the evidence was not unduly prejudicial, we note that the record contains no hint of an appeal to class prejudice or any suggestion that the transferred funds were tainted by anything other than their connection to the fraud that was the subject of this prosecution.

## IV. Conclusion

For the foregoing reasons, we **affirm** Legassa's convictions.